[S.F. No. 24123. July 10, 1980.]

INDUSTRIAL WELFARE COMMISSION et al., Petitioners, v. THE SUPERIOR COURT OF KERN COUNTY et al., Respondents; CALIFORNIA HOTEL AND MOTEL ASSOCIATION et al., Real Parties in Interest.

## COUNSEL

George Deukmejian, Attorney General, Arthur C. de Goede, Assistant Attorney General, Randall P. Borcherding, Joseph M. O'Heron, James M. Schiavenza, Carol Hunter and Ronald V. Thunen, Jr., Deputy Attorneys General, for Petitioners.

Van Bourg, Allen, Weinberg & Roger, Victor J. Van Bourg, David A. Rosenfeld, Joan Bodner, Redburn, Bodner & Palewicz, W. Kenneth Rice, Adrian Andrade and Richard M. Pearl as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Jerome B. Falk, Jr., Dirk M. Schenkkan, Howard, Prim, Rice, Nemerovski, Canady & Pollak, Richard W. Smith, Jan L. Kahn, Kahn & Soares, Richard M. Mosk, Mitchell, Silberberg & Knupp, Jean C. Gaskill, James L. Meeder, Brobeck, Phleger & Harrison, Willard Z. Carr, Jr., Kenneth E. Ristau, Jr., Dennis A. Gladwell, Mark Wm. Shurtleff, Donald B. Ayer, Gibson, Dunn & Crutcher, George J. Tichy II, Richard H. Harding, Michele S. Poohar, Littler, Mendelson, Fastiff & Tichy, Robert P. Roy, Dressler, Stoll, Quesenbery & Hersh and William R. Haerle for Real Parties in Interest.

## OPINION

**TOBRINER, Acting C. J.**—On September 7, 1979, the California Industrial Welfare Commission (hereafter IWC or commission), acting pursuant to its constitutionally and statutorily based authority (Cal.

Const., art. XIV, § 1; Lab. Code, §§ 70-74, 1171-1204),[1] adopted a series of industry-wide "wage orders," prescribing the minimum wages, maximum hours, and standard conditions of employment for employees in this state. These orders (hereafter 1980 wage orders) were scheduled to go into effect on January 1, 1980. In mid-December 1979, however, shortly before the effective date of the orders, numerous employer associations and individual employers (hereafter employers), representing companies which employ millions of California workers, initiated four separate mandate actions in various superior courts throughout the state, challenging the validity of nine of the 1980 wage orders on various grounds.[2] In each of the cases, an alternative writ of mandate issued, along with an order staying each of the nine challenged wage orders in whole or in part.

In a significant number of respects, the December 1979 lawsuits were sequels to similar litigation that had been brought by many of the same organizations and employers several years earlier challenging the 1976 orders adopted by the IWC. In the earlier round of litigation, various courts throughout the state had reached differing conclusions with respect to a number of common legal issues raised in each of the separate lawsuits. As a consequence, in some industries employees were denied the benefits of the 1976 wage orders, while in other industries similarly situated employees were afforded the protections of the orders. After the normal, lengthy process of trial and appeal, one of the cases challenging the 1976 orders reached this court for decision in 1979. In *California Hotel & Motel Assn. v. Industrial Welfare Com.* (1979) 25 Cal.3d 200 [157 Cal.Rptr. 840, 599 P.2d 31], our court resolved several of the common legal issues presented in the challenges to the 1976 wage orders, but at the same time determined that a number of other legal issues "could be dealt with more appropriately" in a future case in which

---

[1]Unless otherwise indicated, all statutory references are to the Labor Code.

[2]The four actions, and the respective wage orders challenged therein, are: (1) Western Growers Assn. et al. v. IWC (Kern County Super. Ct. No. 164537) (challenging orders 8-80 (industries handling products after harvest), 13-80 (industries preparing agricultural products for market, on the farm), 14-80 (agricultural occupations); (2) California Manufacturers Assn. v. IWC (Orange County Super. Ct. No. 325866) (challenging orders 1-80 (manufacturing industry), 3-80 (canning, freezing and preserving industry), 4-80 (professional, technical, clerical, mechanical and similar occupations), 8-80); (3) San Joaquin Nisei Farmers League et al. v. IWC (Stanislaus County Super. Ct. No. 164580) (challenging orders 8-80, 13-80, and 14-80); and (4) California Trucking Association et al. v. IWC (Kings County Super. Ct. No. 31321) (challenging orders 5-80 (public housekeeping industry), 9-80 (transportation industry) and 10-80 (amusement and recreation industry).

the IWC had explained the basis of its wage orders in a fashion consistent with our holding in that case. (25 Cal.3d at pp. 204-205, fn. 2.)

In February 1980, two months after the institution of the four December 1979 lawsuits noted above, the Attorney General, acting on behalf of the IWC, initiated this proceeding seeking an original writ of mandate or prohibition from this court. The Attorney General's petition alleged that each of the four mandate actions filed in December 1979 presented a number of common legal issues, many of which had been raised but left unresolved in *California Hotel & Motel Assn.* The petition also suggested that if the lower court actions were permitted to run their normal course, there was a significant possibility that the history of the 1976 wage order litigation would repeat itself, with lower courts reaching disparate results on common legal issues, and with employees in many industries being deprived of the protection of the 1980 wage orders for perhaps as long as several years. Under these circumstances, the Attorney General urged this court to issue an alternative writ and to provide a prompt and definitive resolution of the numerous common legal issues raised in the various court actions below.

■ In view of the large number of employees affected by the challenged orders, and the tortuous litigation history which had prevented the implementation of the majority of IWC wage orders in recent years, we concluded that this was an appropriate instance for the exercise of our original jurisdiction, and accordingly we issued an alternative writ of mandate. (See, e.g., *Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 402 [128 Cal.Rptr. 183, 546 P.2d 687].) Although the employers claim that we lack jurisdiction to review the legal challenges to any of the 1980 wage orders because none of the trial courts has as yet entered a judgment on the merits, the Court of Appeal in *Rivera* v. *Division of Industrial Welfare* (1968) 265 Cal.App.2d 576, 580-581 [71 Cal.Rptr. 739], acted under similar circumstances to review the validity of an IWC wage order in an original mandate proceeding instituted in the appellate court.[3]

---

[3]The employers additionally argue that this court should not act at this time because there are allegedly numerous factual issues upon which evidence must be taken. We do not believe, however, that the alleged factual disputes preclude our consideration of the employers' legal challenges to the wage orders at this stage. As we explained under similar circumstances in *Burrey* v. *Embarcadero Mun. Improvement Dist.* (1971) 5 Cal.3d 671, 676 [97 Cal.Rptr. 203, 488 P.2d 395]: "Respondents argue that we should not exercise our jurisdiction because there exist numerous questions of fact which must be resolved prior to any decision in the case. The petition for writ of mandate does contain allegations of fact which are controverted by respondent and intervener. We are

Moreover, because the stay orders issued by several of the respondent courts have the practical effect of enjoining the operation of an administrative regulation promulgated pursuant to the IWC's quasi-legislative authority, past authorities teach that if this court concludes that the challenged orders are in fact valid, the lower court's issuance of such quasi-injunctive relief would properly be subject to correction by extraordinary writ. (See, e.g., *Agricultural Labor Relations Bd.* v. *Superior Court, supra*, 16 Cal.3d at p. 401.) Accordingly, we conclude that this matter is properly before this court.

1. *Background and general principles of review.*

Before undertaking an analysis of the numerous legal contentions which the employers have advanced in support of their attack upon the 1980 wage orders, we believe it may be helpful to summarize very briefly the historical background of the IWC's jurisdiction and the established legal principles which govern judicial review of the commission's administrative orders.

The IWC is a five-member appointive board initially established by the Legislature in 1913. For the first 60 years of its existence, the IWC's mission was to regulate the wages, hours and conditions of employment of *women and children* employed in this state, in furtherance of such employees' "health and welfare." To this end, the commission —beginning in 1916—promulgated a series of industry- and occupation-wide "wage orders," prescribing various minimum requirements with respect to wages, hours and working conditions to protect the health and welfare of women and child laborers. For many decades, IWC wage orders have embraced a variety of subjects comparable in scope to the 1980 wage orders at issue in this case.

In the early 1970s, a number of federal judicial decisions invalidated a substantial portion of the then-prevailing IWC wage orders on the ground that the limited application of such orders to *women* workers (and children) violated the prohibition on sex discrimination embodied in title VII of the federal Civil Rights Act of 1964. (See, e.g., *Rosenfeld* v. *Southern Pacific Co.* (9th Cir. 1971) 444 F.2d 1219, 1225-1227; *Homemakers, Inc., Los Angeles* v. *Division of Indust. Welf.* (N.D. Cal. 1973) 356 F.Supp. 1111, affd. (9th Cir. 1974) 509 F.2d 20, cert. den.

---

satisfied that these disputed facts are either not material to our resolution of the case, or may be resolved by judicial notice."

(1976) 423 U.S. 1063 [46 L.Ed.2d 655, 96 S.Ct. 803]; and cases cited, 509 F.2d at p. 23, fn. 7.) In response to these federal decisions, the California Legislature in 1972 and 1973 amended the applicable provisions of the Labor Code to authorize the IWC to establish minimum wages, maximum hours and standard conditions of employment for *all* employees in the state, men as well as women. (Stats. 1972, ch. 1122, §§ 2-6, pp. 2153-2155; Stats. 1973, ch. 1007, §§ 1.5-4, pp. 2002-2003.) The constitutionality of this legislative expansion of the IWC's jurisdiction to all California workers is explicitly confirmed by article XIV section 1 of the California Constitution which declares: "The Legislature may provide for minimum wages and for the general welfare of employees and for those purposes may confer on a commission legislative, executive and judicial powers."[4]

Although the 1973 modification of the IWC's jurisdiction to encompass men as well as women and minors clearly worked a substantial expansion in the number of workers affected by the commission's orders, and, as a practical matter, was probably a major impetus to the host of litigation that has surrounded the commission's wage orders since 1973, the 1973 legislation did not alter the basic nature of the IWC's decision-making authority or the basic principles governing judicial review of the commission's exercise of that authority. From its inception in 1913 to the present, the commission has been vested with broad statutory authority to investigate "the comfort, health, safety, and welfare" of the California employees under its aegis (§ 1173, enacted Stats. 1913, ch. 324, § 3, p. 633) and to establish (1) "[a] minimum wage...which shall not be less than a wage adequate to supply...the necessary cost of proper living and to maintain the health and welfare of such [employees]," (2) "[t]he maximum hours of work consistent with the health and welfare of [such employees]" and (3) "[t]he standard conditions of labor demanded by the health and welfare of [such employees]..." (§ 1182, enacted Stats. 1913, ch. 324, § 6, pp. 634-635.)

Indeed, the 1973 act—while retaining the authorizing language of section 1182 quoted above—restated the commission's responsibility in

---

[4]Article XIV section 1 replaced former article XX, section 17-1/2 which, prior to 1970, provided: "The Legislature may, by appropriate legislation, provide for the establishment of a minimum wage for women and minors and may provide for the comfort, health, safety and general welfare of any and all employees. No provision of this Constitution shall be construed as a limitation upon the authority of the Legislature to confer upon any commission now or hereafter created, such power and authority as the Legislature may deem requisite to carry out the provisions of this section."

even broader terms, directing the commission continually to review and to update its "rules, regulations and policies to the extent found by the commission to be necessary to provide *adequate and reasonable wages, hours, and working conditions appropriate for all employees in the modern society.*" (Italics added.) (§ 1173, enacted Stats. 1973, ch. 1007, § 1.5, p. 2002.)

Judicial authorities have repeatedly emphasized that in fulfilling its broad statutory mandate, the IWC engages in a quasi-legislative endeavor, a task which necessarily and properly requires the commission's exercise of a considerable degree of policy-making judgment and discretion. (See, e.g., *California Hotel & Motel Assn., supra*, 25 Cal.3d 200, 211; *California State Restaurant Assn. v. Whitlow* (1976) 58 Cal.App. 3d 340, 344 [129 Cal.Rptr. 824]; *California Grape etc. League v. Industrial Welfare Com.* (1969) 268 Cal.App.2d 692, 708 [74 Cal.Rptr. 313]; *Rivera v. Division of Industrial Welfare, supra*, 265 Cal.App.2d 576, 586, 591, 595.)

Because of the quasi-legislative nature of the IWC's authority, the judiciary has recognized that its review of the commission's wage orders is properly circumscribed. ■ As the Court of Appeal noted in *Rivera, supra*, 265 Cal.App.2d 576, 594: "A reviewing court does not superimpose its own policy judgment upon a quasi-legislative agency in the absence of an arbitrary decision; rather, the review is limited to an examination of the proceedings to determine whether the action is arbitrary or entirely lacking in evidentiary support or whether the agency has violated the procedure required by law; in these technical matters requiring the assistance of experts and the collection and study of statistical data, courts let administrative boards and officers work out their problems with as little judicial interference as possible." (Fn. omitted.)

■ Moreover, past decisions additionally teach that in light of the remedial nature of the legislative enactments authorizing the regulation of wages, hours and working conditions for the protection and benefit of employees, the statutory provisions are to be liberally construed with an eye to promoting such protection. As the court observed in *California Grape etc. League, supra*, 268 Cal.App.2d 692, 698; "Remedial statutes such as those under consideration [i.e., the statutes governing the adoption of wage orders] are to be liberally construed. [Citation.] They are not construed within narrow limits of the letter of the law, but rather are to be given liberal effect to promote the general object sought to be accomplished.... [¶] Regulations and orders of the Industrial Welfare

Commission are presumed to be *reasonable and lawful."* (Italics in original.)

With these general principles of judicial review and statutory construction in mind, we turn to the numerous legal challenges which the employers have mounted against the IWC's 1980 wage orders. The employers contend that the 1980 wage orders are fatally flawed on both procedural and substantive levels. Procedurally, the employers argue that the wage orders are invalid because the IWC (1) failed to conduct an adequate "investigation" under section 1178 before selecting wage boards, (2) failed to include an adequate "statement as to the basis upon which the order is predicated" as required by section 1177, and (3) failed to comply with the requirements of the California Environmental Quality Act of 1970 (CEQA) prior to the adoption of the orders.

Substantively, the employers contend (1) that all of the various provisions of the wage orders dealing with the health and safety of employees are invalid because only the California Occupational Safety and Health Standards Board, and not the IWC, has jurisdiction to act on such matters and (2) that various labor relation statutes preclude the IWC from setting fixed minimum standards with respect to matters that the labor laws leave to the collective bargaining process between employers and employees. As we explain, we have concluded that none of these objections to the 1980 wage orders has merit.[5]

2. ■ *The IWC complied with the pre-wage board "investigation" requirements of section 1178.*

The employers initially contend that all of the 1980 wage orders are invalid in their entirety because the IWC allegedly failed to comply with an initial step in the elaborate procedure established by Labor Code section 1178 for the adoption of commission regulations fixing minimum wages, maximum working hours and standard conditions of employment. To place this contention in context, we set forth the lengthy provisions of section 1178 in full.

---

[5]In addition to the general common legal issues enumerated above, a number of the mandate actions filed below set forth additional contentions directed at more specific and limited portions of the various wage orders. We address these additional contentions in section 7 below, and conclude that all of these challenges also lack merit.

Section 1178 provides: "If after investigation the commission finds that in any occupation, trade, or industry, the wages paid to employees are inadequate to supply the cost of proper living, or that the hours or conditions of labor are prejudicial to the health, morals, or welfare of employees, the commission shall select a wage board to consider any of such matters. Such wage board shall be composed of an equal number of representatives of employers and employees in the occupation, trade, or industry in question; and a representative of the commission to be designated by it, who shall act as chairman of the wage board on request of the commission. The wage board shall report and make recommendations to the commission, including therein:

"(a) An estimate of the minimum wage adequate to supply the necessary cost of proper living to, and maintain the health and welfare of employees engaged in the occupation, trade, or industry in question.

"(b) The number of hours of work per day in the occupation, trade, or industry in question, consistent with the health and welfare of employees.

"(c) The standard conditions of labor in the occupation, trade, or industry in question, demanded by the health and welfare of employees.

"Before promulgating an order relating to wages, hours, or conditions of labor for the occupation, trade, or industry in question, and after receipt of the report from the wage board, the commission shall prepare proposed regulations for the occupation, trade, or industry in question and then shall hold a public hearing. The proceedings shall be recorded and transcribed and shall thereafter be a matter of public record. Whenever the occupation, trade, or industry in question is statewide in scope, a public hearing shall be held in each of two cities in this state; when it is not statewide, a public hearing shall be held in the locality where the occupation, trade, or industry prevails."

The employers concede that before the 1980 wage orders were adopted (1) the IWC convened wage boards for each of the industrial and occupational groupings to consider the updating of its prior wage orders, (2) the wage boards received recommendations and statements from affected individuals and prepared wage board reports containing recommendations as to revisions, (3) the IWC reviewed the wage board reports and the records of the wage board proceedings and, after deliberation, prepared and published proposed revisions of the existing wage

orders, (4) the IWC held public hearings throughout the state on the proposed revisions, and (5) the IWC considered the additional matters raised in the public hearings, amended its proposed orders, and finally on September 7, 1979, adopted its 1980 wage orders together with a statement as to the basis of each order.

Despite this extensive procedure, the employers, focusing upon the initial passage of section 1178 which states that "[i]f *after investigation* the commission finds that...the wages paid to employees are inadequate to supply the cost of proper living, or that the hours and conditions of labor are prejudicial to the health, morals or welfare of employees, the commission shall select a wage board to consider any of such matters...." (italics added), maintain that the 1980 wage orders are invalid because of the commission's alleged failure to conduct an "adequate" investigation *prior to* convening the wage boards. The plaintiffs in *California Hotel & Motel Assn.* raised a similar contention, but our court ultimately concluded that we did not need to determine the general scope of the pre-wage board investigation provision of section 1178 in that case, for we found that other provisions of the 1973 legislation, directing the IWC to undertake a "full review" of its orders "forthwith," had in any event relieved the commission of any separate pre-wage board investigation requirement prior to the promulgation of the 1976 wage orders. (See 25 Cal.3d at pp. 206-209.) We now address the issue which we did not reach in *California Hotel & Motel Assn.*, and, as we shall explain, we conclude that the IWC fully complied with the requirements of section 1178.[6]

On May 8, 1978, the IWC voted to open the 1976 wage orders for full review by wage boards. At that time, the commission unanimously

---

[6]In addition to contending that it has fully complied with the pre-wage board investigation provision of section 1178, the IWC points out that section 1173, as amended in 1973, directed the commission not only to undertake a "full review" of its orders "forthwith," but also required the commission to "conduct such a full review *at least once every two calendar years*, or at such more frequent times as the commission, based upon then current conditions, deems appropriate." (Italics added.) (Stats. 1973, ch. 1007, § 1.5, p. 2002.)

The commission maintains that, as in *California Hotel & Motel Assn.*, this statutory mandate of a "full review" of existing orders at least once every two years itself authorizes the commission, as part of its biennial review, to convene wage boards without regard to any prewage board investigation. Because, as we explain below, we conclude that the commission complied with the preliminary investigation requirements of section 1178, we need not decide whether section 1173's mandate of a full review once every two years in itself empowers the commission to initiate the wage board procedure as part of its full review.

adopted a statement explaining that "Section 1173 of the Labor Code requires that the Commission conduct a full review of all existing rules, regulations and policies made under its jurisdiction at least once every two calendar years. *The Commission has made a continuous investigation of wages, hours, and working conditions affecting employees in industries, trades and occupations covered by its orders, and it also takes official notice of the substantial inflation affecting all members of society, and the recent increase in the federal minimum wage.* It thereby concludes that it would be imperative to conduct a full review of the existing wage orders in order to provide for the health and welfare of employees and wages adequate to supply them with the necessary cost of proper living even if Section 1173 did not dictate a full review at that time." (Italics added.)

Although the employers acknowledge that the commission, as part of its on-going duties under section 1173,[7] gathers a voluminous quantity of statistical and other data from governmental and private studies with respect to economic trends and employment conditions,[8] the employers contend that this normal on-going commission activity does not constitute "adequate" investigation to satisfy the "after investigation" provision of section 1178. While the employers concede that section 1178 establishes no standard as to the required depth or breadth of investigation contemplated before wage boards are convened, the employers apparently maintain that the investigation in this case was not adequate because it did not involve field investigation and did not apprise the commission of *specific* changes that were needed in the existing wage orders.

---

[7]Section 1173 provides in relevant part: "*It shall be the continuing duty of the Industrial Welfare Commission . . .* to ascertain the wages paid to all employees in this state, and to ascertain the hours and conditions of labor and employment in the various occupations, trades, and industries in which employees are employed in this state, and *to investigate the comfort, health, safety, and welfare of such employees.*" (Italics added.)

[8]The administrative record in this case contains a variety of information obtained by the commission members prior to their decision to convene wage boards to review the existing wage orders. That information includes: (1) proposed and enacted state and federal legislation affecting wages, hours, and working conditions, (2) complaints and correspondence from employees and employers concerning wages, hours and working conditions, (3) studies, surveys, reports and bulletins from the California Department of Industrial Relations, and the California Health and Welfare Agency, and from the United States Department of Labor and Department of Agriculture, and (4) transcripts of hearings held by the IWC with respect to minimum wage and related compensation.

We think the employers have misconceived the nature of the preliminary investigation contemplated by section 1178, as well as the administrative agency's discretion in determining the extent of the investigation necessary. As the United States Supreme Court has explained in a similar context: "[An agency's] duty to investigate is a duty to make such investigation as the nature of the case requires. An investigation is 'essentially informal, not adversary'; it is 'not required to take any particular form.' [Citation.] These principles are particularly apt . . . where Congress has simply told the [agency] to investigate and has left to it the task of selecting the methods and procedures which it should employ in each case." (*Railway Clerks* v. *Employees Assn.* (1965) 380 U.S. 650, 662 [14 L.Ed.2d 133, 141-142, 85 S.Ct. 1192]; see, e.g., *Inland Empire Council* v. *Millis* (1945) 325 U.S. 697, 706 [89 L.Ed. 1877, 1883, 65 S.Ct., 1316]; *Ruby* v. *American Airlines, Inc.* (2d Cir. 1963) 323 F.2d 248, 255.)

As the full text of section 1178 makes clear, the pre-wage board investigation contemplated by the statute is only the first step in a lengthy administrative process by which the IWC determines whether existing wage orders are adequate and decides if and how any present orders should be modified. The section does not require the commission to formulate specific proposed modifications of the present orders before selecting the wage boards; indeed, as the Court of Appeal observed in *California Grape etc. League*, "it would be contrary to the clear purpose of the statute for the commission to arrive at specific proposals without benefit of the views and advice of interested persons on the wage board and at the public hearings." (268 Cal.App.2d 692, 708.)

Instead, the investigation contemplated is simply a preliminary inquiry to determine whether there is sufficient question as to the adequacy of the existing wage orders that wage boards ought to be selected. In this context, we think that the commission's reliance on the statistical and other data compiled in its normal investigative process, along with its consideration of the obvious effect on employees of the economy's rapidly increasing inflation, clearly sufficed to justify the convening of wage boards to review the adequacy of the existing orders under section 1178.

Authorities construing statutes embodying similar preliminary investigation requirements confirm this conclusion. In *Modern Plastics Corporation* v. *McCulloch* (6th Cir. 1968) 400 F.2d 14, for example, an employer sought to enjoin the NLRB from conducting a representa-

tion election among the company's employees on the ground that the NLRB had failed to comply with section 9(c) of the NLRA (29 U.S.C. § 159(c)) which provides in part that "[w]henever a [representation] petition shall have been filed...the Board *shall investigate* such petition...." (Italics added.) In rejecting the employer's contention, the *Modern Plastics* court pointed out that the investigation contemplated by the statute was simply a preliminary inquiry to determine whether there was sufficient question as to representation so as to warrant holding a formal hearing on the issue. Because the investigation contemplated by the statute was only a threshold step leading to further administrative procedures, the court concluded that the agency had not violated the statute merely because it had not undertaken any formal field investigation before deciding to go forward with a hearing, when the facts before the relevant administrative official "were not so plainly insubstantial that he could not reasonably conclude that a sufficient question of representation existed to justify inquiry through the usual ...hearing." (400 F.2d at p. 19.)

In like manner, the facts within the knowledge of the commission in May 1978—by virtue of its continuing investigation and the readily ascertainable increasing inflation—were certainly sufficient to permit the commission to conclude that "further inquiry" into the adequacy of the existing wage orders through the wage board procedure was warranted. Under these circumstances, the commission did not violate section 1178 in reopening the wage orders for review by wage boards.

Our conclusion in this regard is buttressed by the history of section 1178. The "after investigation" language of section 1178 relied upon by the employers has been part of California law since the inception of the IWC in 1913. (Stats. 1913, ch. 324, § 5, p. 634.) Past cases indicate that the commission has long interpreted the statute as authorizing the opening of existing wage orders and the convening of wage boards on the basis of its review of data comparable to the matters that were before the IWC in the instant case. (See, e.g., *Rivera* v. *Division of Industrial Welfare* (1968) 265 Cal.App.2d 576, 582-584, 590 [71 Cal. Rptr. 739]. See also *Cal. Drive-in Restaurant Assn.* v. *Clark* (1943) 22 Cal.2d 287, 301 [140 P.2d 657, 147 A.L.R. 1028].)

Furthermore, while section 1178 has been amended on several occasions, the Legislature has never altered the "after investigation" language to indicate that the commission's long-standing interpretation of the section is erroneous. As California courts have noted, "[r]eenact-

ment of a provision which has a meaning well established by administrative construction is persuasive that the intent was to continue the same construction previously recognized and applied." (*Cal. M. Express* v. *St. Bd. of Equalization* (1955) 133 Cal.App.2d 237, 239-240 [283 P.2d 1063]; see, e.g., *Coca Cola Co.* v. *State Bd. of Equalization* (1945) 25 Cal.2d 918, 922 [156 P.2d 1].)

Finally, even if the commission's pre-wage board investigation was in some respects inadequate—which we do not believe to be the case—we do not understand how such a deficiency realistically prejudiced the employers so as to justify setting aside the entire 1980 wage orders. (Cf. *Modern Plastics Corp.* v. *McCulloch, supra,* 400 F.2d 14, 17, fn. 5.) The employers had a full opportunity during both the wage board proceedings and the subsequent public hearings to fully apprise the commission of all relevant facts and to present arguments and recommendations either in support of or in opposition to changes in the wage orders. Under these circumstances, we would be loath to overturn vital administrative regulations on the basis of a minor, nonprejudicial misstep. As the Fifth Circuit Court of Appeals has observed: "Courts . . . , as partners with . . . agencies in the effectuation of [legislative] will through the administrative process, . . . do not function to strike down agency action because of merely formal or technical flaws." (*Ala. Ass'n of Ins. A.* v. *Bd. of Gov. of F. R. System* (5th Cir. 1976) 533 F.2d 224, 236.)

Accordingly, we conclude that the IWC adequately complied with section 1178 prior to convening wage boards to consider the 1980 wage orders.

3. ■ *The "statements as to basis" accompanying the 1980 wage orders comply with the requirements of section 1177 as articulated in* California Hotel & Motel Assn. v. Industrial Welfare Com. *(1979) 25 Cal.3d 200.*

The employers next contend that in adopting the 1980 wage orders the IWC failed to comply with Labor Code section 1177 which provides in relevant part: "Each order of the commission shall include a statement as to the basis upon which the order is predicated and shall be concurred in by a majority of the commissioners." The employers acknowledge that each of the commission's 1980 orders includes a lengthy document entitled "Statement as to Basis," concurred in by a majority of the commissioners, providing a section-by-section analysis and expla-

nation for each portion of the accompanying wage orders. The employers maintain, however, that the statements are not sufficiently detailed to satisfy the statutory requirements of section 1177 under this court's recent decision in *California Hotel & Motel Assn.* As we shall explain, the employers' contention misconceives the basic thrust of this court's holding in *California Hotel & Motel Assn.* and, contrary to that decision, seeks to read into section 1177 unreasonably burdensome requirements that are basically incompatible with the commission's quasi-legislative task.

In *California Hotel & Motel Assn.*, this court reviewed the validity of one of IWC's 1976 wage orders, order 5-76, dealing with the public housekeeping industry. Unlike the 1980 wage orders now before us, the order contained no provision or document which specifically purported to be a statement as to the basis of the order as required by section 1177. The commission, however, contended that the statement as to basis requirement of section 1177 was satisfied by a paragraph in the order, entitled "TO WHOM IT MAY CONCERN," which read as follows:

"TO WHOM IT MAY CONCERN: TAKE NOTICE: That pursuant to the Legislature's 1973 mandate to the Industrial Welfare Commission to review, update and promulgate regulations necessary to provide adequate and reasonable wages, hours, and working conditions appropriate for all employees, and by virtue of authority vested in the Commission by section 1171 through 1204 of the Labor Code of the State of California, and after investigation and findings pursuant to section 1178 and after receiving recommendations from duly appointed wage boards, and after consideration of all written material and information submitted, and after public hearings duly held, notice of said hearings having been duly given in the manner provided by law, the Industrial Welfare Commission, upon its own motion has found and concluded that its Public Housekeeping Industry Order, Number 5-68, enacted on September 24, 1967 and its Minimum Wage Order 1-74 enacted on January 1, 1974, should be altered and amended.

"NOW, THEREFORE, the Industrial Welfare Commission of the State of California does hereby alter and amend said Public Housekeeping Industry Order, Number 5-68, and its Minimum Wage Order 1-74."

In *California Hotel & Motel Assn.* our court rejected the commission's contention in this regard, concluding that the commission had misinterpreted the fundamental purpose of section 1177 by suggesting

that the provision could be satisfied by a statement which simply listed the statutory basis, i.e., the authorizing statutes, for the agency's regulatory action. Instead, adverting to the legislative history of the provision and to an analogous provision of the federal Administrative Procedure Act (APA),[9] we pointed out that the statute was a response to the Legislature's belief "that the public has a right to know *the reasons for the laws which govern them*" (italics added) (25 Cal.3d at p. 210, fn. 21), and accordingly we concluded that section 1177 contemplated that the IWC would provide a reasoned explanation to accompany its orders, an explanation that would "reflect the factual, legal and policy foundations for the action taken." (*Id.*, at p. 213.)[10]

At the same time, however, we recognized that in promulgating wage orders the IWC is involved in a quasi-legislative, rather than a quasi-judicial endeavor, and we cautioned that "[t]he statement of basis is not the equivalent of the findings of fact that a court may be required to make." (*Id.*) Instead, we emphasized that what section 1177 demands is simply "*an explanation of how and why the Commission did what it did.*" (Italics added.) (*Id.*) Because the "To Whom it May Concern" paragraph did not fulfill this basic function, we concluded that the commission had failed to comply with section 1177 in initially adopting order 5-76.

The 1980 wage orders at issue in this case were promulgated shortly after this court's decision in *California Hotel & Motel Assn.*, and the

---

[9]Section 4(c) of the APA (5 U.S.C. § 553(c)) reads in pertinent part: "After consideration of the relevant matters presented [in an informal rule-making proceeding], the agency shall incorporate in the rules adopted *a concise general statement of their basis and purpose.*" (Italics added.) In view of the similarity of this provision to section 1177, we indicated in *California Hotel & Motel Assn.* that federal authorities construing section 4(c), while not controlling, will often be persuasive in interpreting section 1177. (See 25 Cal.3d at p. 210, fn. 20; *id.*, at pp. 219-220 (Christian, J., conc.).) As noted *post*, we have utilized a number of such federal authorities in reaching our conclusions in the instant case.

[10]We explained this requirement as follows: "If terms of the order turn on factual issues, the statement must demonstrate reasonable support in the administrative record for the factual determinations. If, on the other hand, the terms of the order turn on policy choices, an assessment of risks or alternatives, or predictions of economic or social consequences, the statement of basis must show how the commission resolved conflicting interests and how that resolution led to the order chosen. If an order differentiates among classes of industries, employers, or employees, the statement of basis must show that the distinctions drawn are reasonably supported by the administrative record and are reasonably related to the purposes of the enabling statute." (25 Cal.3d at p. 214.)

statements as to the basis of such orders were quite evidently drafted with that decision's guidelines firmly in mind. Unlike the "To Whom it May Concern" paragraph of the initial 1976 orders, the statements accompanying the 1980 orders deal directly with the substantive provisions of each of the orders, and provide concise and clearly worded explanations for the various provisions of those orders. The statements make frequent reference to specific comments and recommendations raised in the course of the lengthy administrative proceedings and indicate why the commission decided to adopt some proposals and declined to adopt others; when the wage orders impose different regulations on some industries than are imposed on others, or exempt some occupations from generally applicable requirements, the statements explain the differential treatment. Indeed, a reading of the numerous statements as to basis in the 1980 orders leaves little doubt that the commission has made a thorough and conscientious effort to explain "how and why [it] did what it did." (25 Cal.3d at p. 213.)

The employers assert, however, that the commission's efforts in this regard were insufficient, and they level a multi-pronged attack challenging the adequacy of virtually every statement as to basis in all of the wage orders under review. We do not believe that it is necessary, in this proceeding, to review each of the employers' numerous attacks separately. As we shall explain, an analysis of several representative challenges mounted by the employers reveals the general tenor and, in our view, misguided nature, of the employers' various contentions.

The employers initially challenge the adequacy of the statement as to basis relating to section 3 of the wage orders, concerning "Hours and Days of Work." The statement adopted by the commission reads in relevant part:

"The 8-hour day, 40-hour week is an accepted standard in American society. Federal law embodying these standards (Walsh-Healey Act and Fair Labor Standards Act) was enacted with the purpose of encouraging employers to hire more employees when they have need for labor in excess of 40 hours a week. The California Legislature declares that 'eight hours of labor constitutes a day's work' (Labor Code Section 510). Employee representatives continue to express their conviction that a regular schedule of work beyond eight hours a day is detrimental to the health and welfare of employees.

"The Commission relies on the imposition of a premium or penalty pay for overtime work to regulate maximum hours consistent with the health and welfare of employees covered by this order. Employers have objected to the requirement for overtime pay after 8 hours a day and in 1976 they urged a 10-hour day without overtime, asserting that employees favored such a schedule to save travel time and expense and to have more leisure for weekend trips. The Commission provided for such alternative in the 1976 Order, specifying conditions under which employees could exercise a choice. In the review just completed, employee representatives [o]n the wage board and in public hearing asked that the provisions for four 10-hour days be deleted. Some complained that once employees voted for such a schedule there was no way to get out of it even when employees found, from experience, that it was detrimental to their welfare. Employer representatives on wage boards and in public hearing proposed an alternative of three or four workdays of not more than 12 hours each without overtime. In view of the accepted 8-hour day standard, social experience, and testimony by employees the Commission determined that a 12-hour day generally is detrimental to the welfare of employees. Where, in special circumstances, employees and employer agree in collective bargaining that it is not detrimental, provision is made for such exception as described below. The Commission did retain the provision for the week of four 10-hour days, and made it more flexible at the request of some employers and employees by allowing the four days to be worked any time within the work week so long as the employee received two consecutive days off. Previously the four days had to be scheduled within five consecutive days.

"At the same time the Commission acknowledges the employees' problem of being trapped in such a schedule when it proved to be detrimental and provided a means of voting out such a schedule (Section 3(B)(4)) under reasonable conditions which protect the employer against frivolous or too frequent changes."

In questioning the adequacy of this lengthy statement, the employers concede that "[i]t would be difficult to attack the Commission's apparent conclusion that an eight hour day is consistent with the health and welfare of employees" but argue that the statement is deficient for failing to indicate why the Commission concluded that "an eight-hour day is the *only* work day consistent with the health and welfare of employees." (Employers' italics.) In a similar vein, the employers argue that the statement does not satisfy the requirement of section 1177, as interpreted in *California Hotel & Motel Assn.*, because while the statement

explains why the commission decided to permit a 10-hour day, 4-day week without overtime pay, it does not indicate why the commission did not permit any other alternative 40-hour week.

In essence, the employers' contention amounts to an assertion that under section 1177, the commission must not only explain why it adopted the orders that it did, but also detail its reason for not adopting the myriad of possible alternatives to its regulations. Such an interpretation of section 1177, however, would be totally impractical and would impose an unreasonable burden upon the agency. As one federal court has explained in an analogous context. "A rule-making agency makes not one but dozens of 'ultimate' decisions—not only because a set of regulations has many provisions, but also because adoption of any one provision constitutes simultaneous rejection of many possible alternatives.... [¶] For these reasons we think petitioners' expansive reading of the 'findings' requirements...[to require findings as to such alternatives] is inherently unrealistic. To require [such] findings of a rule-making agency...would be to invite endless confusion and great uncertainty." (*Amoco Oil Co.* v. *Environmental Protection Agency* (D.C.Cir. 1974) 501 F.2d 722, 734-735.)

Indeed, we think that the governing legislation itself demonstrates that the Legislature, in enacting section 1177, did not intend to require the extraordinarily extensive statement as to basis that would be required under the employers' proposed interpretation. As we recognized in *California Hotel & Motel Assn., supra,* 25 Cal.3d at page 215, section 1177 provides that the statement as to basis is to be included as an integral part of each wage order; section 1183, in turn, requires that the commission mail a copy of such orders to employers covered by the order and directs such employers to "post a copy thereof in the building in which employees affected by the order are employed." These statutes demonstrate that the Legislature contemplated that the statement as to basis would take a form that could reasonably be posted in places of employment and could be read and understood by the employers and employees affected by the order.

This legislative purpose of effectively informing employers and employees of the basic reasons for the commission's actions would be defeated if we were to interpret the statute to require a statement so lengthy and detailed that, in practice, such statement would have to been printed in extremely small type or in a document so extended that no one could reasonably be expected to read it. As the United States

Supreme Court has recently emphasized in another context: *"Meaningful* disclosure does not [necessarily] mean *more* disclosure. Rather, it describes a balance between 'competing considerations of complete disclosure...and the need to avoid...[informational overload].'" (*Ford Motor Credit Co.* v. *Milhollin* (1980) 444 U. S. 555, 568 [63 L.Ed.2d 22, 33, 100 S.Ct. 790, 798].)

The employers also challenge the adequacy of the statements as to the basis of a number of sections of the 1980 wage orders in which the commission made no changes whatsoever from previous wage orders. Thus, for example, the statement as to the basis of section 12, Rest Periods,[11] reads: "The Commission received no compelling evidence and concluded that there was no rationale to warrant any change in this section, *the basic provisions of which date back to 1932.* It also noted that administrative exemptions are available if warranted under provisions of section 17 of this order." (Italics added.) The employers contend that even when no change from a previous order is implemented, section 1177 requires the IWC to provide a full explanation for the *original* adoption of the provision and precludes the commission from simply indicating the historical basis of the order.

As this court explained in *California Hotel & Motel Assn.,* however, the legislative history of section 1177 indicates that the section was intended to ensure that the commission would "accompany any *new* or *revised* order" with an explanation for the agency's determinations. (Italics added.) (25 Cal.3d at p. 210, fn. 21.) When the commission, on the basis of its investigation, wage board proceedings and public hearings, determines that an existing regulation should be altered or a new regulation promulgated, section 1177 requires that the commission explain the reason for the new or revised rule. When the commission concludes that no such modification is warranted, however, no comparable explanation is necessary, for the commission is simply continuing in effect a regulation that has previously become a part of the standard working conditions of "employees in the modern society." (§ 1173.) Although we can perhaps conjure that, under some circumstances, un-

---

[11]The rest period provision of wage order 1-80 provides in full: "Every employer shall authorize and permit employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof.

"However, a rest period need not be authorized for employees whose total daily work time is less than three and one-half (3-1/2) hours. Authorized rest period time shall be counted as hours worked for which there shall be no deduction from wages."

derlying societal conditions may so change as to reasonably require an explanation from the IWC for its decision to continue a particular working condition regulation in effect, we do not believe that the commission's retention of the long-standing provisions in this case—involving rest periods, meal periods, and the like—require any such justification.

Finally, the employers contend that a number of the statements as to basis are deficient even though they contain a general explanation of the commission's actions because the statements do not specifically respond to some comments or suggestions raised by wage boards or affected individuals at some point in the administrative process. Once again, however, the employers' argument would expand the statement as to basis beyond all reasonable bounds. As the Fifth Circuit has observed with respect to the analogous "statement of basis and purpose" called for by section 4(c) of the federal APA: "It is not expected that the agency will discuss in detail every item of fact or opinion included in the comments submitted to it. [What] is expected [is] that the agency's concise general statement of basis and purpose...'will enable us to see what *major issues of policy were ventilated by the [administrative] proceedings and why the agency reacted to them as it did.*'" (Italics added.) (*General Telephone Co. of Southwest* v. *United States* (5th Cir. 1971) 449 F.2d 846, 862.) In our view the statements as to the basis of the 1980 wage orders adequately fulfill this function.

In sum, we conclude that the 1980 statements as to basis, promulgated in the wake of this court's decision in *California Hotel & Motel Assn.*, satisfy the requirements of section 1177 as articulated in that decision.

4. ■ *The IWC did not violate the provisions of CEQA in promulgating the 1980 wage orders, since such orders are specifically exempted from the statutory requirements under title 14, section 15124 of the California Administrative Code.*

The employers next argue that the 1980 wage orders are invalid because of the IWC's alleged failure to comply with the requirements of CEQA, relating to the preparation of an "environmental impact report" or a "negative declaration," prior to the promulgation of its wage orders. As we explain, this contention is clearly without merit, for the

commission's wage orders have been explicitly exempted from the statutory requirements of CEQA by a valid administrative regulation.

In enacting CEQA to protect the environment of California, the Legislature recognized that not all actions of governmental agencies have significant environmental effect, and concluded that it was desirable to exempt certain categories of governmental actions from the generally applicable requirements of the statute. Accordingly, the Legislature in section 21084 of the Public Resources Code, directed the Secretary of the California Resources Agency to promulgate as part of the administrative guidelines governing the administration of CEQA, "a list of classes of projects which have been determined not to have a significant effect on the environment and which shall be exempt from the provisions of this division."

Acting pursuant to this directive, the Secretary of Resources has established a list of classes of projects which, by regulation, are declared "to be categorically exempt from the requirement for the preparation of environmental documents." In February 1978, the secretary adopted section 15124 of title 14 of the California Administrative Code which categorically exempts from CEQA's requirements "actions taken by regulatory agencies, including the Industrial Welfare Commission as authorized by statute to regulate any of the following: (a) Employee wages, (b) Hours of work, or (c) Working conditions where there will be no demonstrable physical changes outside the place of work." Under this regulation, the IWC had no obligation to prepare an environmental impact report or negative declaration prior to the adoption of the wage orders at issue here.[12]

Although the employers recognize that the regulation in question exempts IWC wage orders from the application of CEQA, the employers contend that the Secretary of Resources exceeded his statutory authority in adopting section 15124. In support of this argument, the employers rely on this court's decision in *Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 204-206 [132 Cal.Rptr. 377, 553 P.2d 537], in which we held that an administrative regulation categorically exempting "actions taken...to assure the maintenance, restoration or enhancement of a natural resource..." could not properly be interpret-

---

[12]Before promulgating the 1980 orders, the IWC specifically made a written finding. "that none of its proposed regulations would make a demonstrable physical change outside the place of work or have a significant effect on the environment,"

ed as creating an exemption from CEQA for actions of the Fish and Game Commission in fixing hunting or fishing seasons.

In reaching that conclusion in *Wildlife Alive*, however, we recognized that "the setting of hunting and fishing seasons has the potential for a significant environmental impact, both favorable and unfavorable," and that "[t]here inheres in the fixing of hunting seasons and the issuance of hunting permits a serious risk of overkill and depletion of the affected species." (18 Cal.3d at p. 206.) Noting that under section 21084 "[t]he secretary is empowered to exempt only those activities which do not have a significant effect on the environment" (*id.*, at p. 205), we concluded that because of the obvious possibility that the setting of hunting and fishing seasons would have a significant effect on the environment, an interpretation of the exempting regulation to cover such administrative acts would cast doubt on the validity of the regulation.

From an environmental standpoint, however, the wage orders at issue in this case are obviously a far cry from the administrative regulations fixing hunting and fishing seasons which were before our court in *Wildlife Alive*. Unlike hunting and fishing season regulations which affect wildlife in a very direct and unambiguous manner, the IWC regulations governing the wages, hours and working conditions of employees have no obvious effect on the environment.

Indeed, the employers in the present case in effect concede the absence of any such *direct* effect, arguing only that the categorical exemption is improper because of certain alleged *collateral* consequences to the environment which the employers claim may possibly be engendered by the commission's wage orders. Thus, for example, the employers attacking the IWC wage orders with respect to agricultural industries argue that "[t]he 1980 provisions with regard to hours and days of work are much more restrictive and financially more costly [than prior orders, and thus] may well have the effect of forcing employers to turn to mechanization or automation [which in turn] will result in the greater use of machines and fuel of all types and, therefore, may have a significant effect on the environment." In a similar vein, the growers contend that it is "likely that increased mechanization of agricultural operations will cause greater dust and noise pollution in areas adjacent to metropolitan centers" and also allege that "increased wages and overtime provisions will have the probable effect of increasing the sale of agricultural land to developers for urban purposes, thereby having an increasingly significant environmental impact."

Aside from the obvious speculation implicit in the employers' argument, it is not the IWC regulation of wages, hours and working conditions that, in the employers' scenario may significantly affect the environment, but rather it is the employers' own future actions, *not* called for by the wage orders, that may have such an effect. To the extent that such future actions by growers may adversely affect the environment, of course, the employers will be subject to regulation by a variety of state and federal environmental protection agencies. In any event, however, we think that the mere possibility that an employer may respond to the requirements of a wage order by adopting measures that may endanger the environment does not undermine the validity of the Secretary of Resources' conclusion that the IWC's promulgation of wage orders is categorically exempt from CEQA's requirements.

Accordingly, the IWC did not violate CEQA in adopting its 1980 wage orders.

5. ■ *In the absence of a conflict with regulations promulgated by the California Occupational Health and Safety Standards Board, the IWC may adopt wage orders relating to the health or safety of employees.*

In addition to the various procedural contentions discussed above, the employers contend that the IWC exceeded its *substantive* authority in promulgating a number of the provisions included in all of the 1980 wage orders. In this regard, the employers initially focus on those sections of the wage orders which deal with matters generally relating to the health and safety of employees, e.g., provisions regulating meal periods (§ 11), rest periods (§ 12), seats (§ 14) and temperature (§ 15). The employers contend that under the current statutes only the California Occupational Safety and Health Standards Board (hereafter Cal/OSHA), formerly the Industrial Safety Board (see § 140, subd. (e)), has jurisdiction to act with respect to such matters and that, as a consequence, the IWC regulations in this field are null and void.

The employers' argument rests in principal part upon a portion of section 1173 that was added to the statute in 1973. The relevant paragraph reads: "Before adopting any new rules, regulations or policies, the commission shall consult with the Industrial Safety Board to determine those areas and subject matters where the respective jurisdiction of the commission and the Industrial Safety Board overlap. In the case of such overlapping jurisdiction, the Industrial Safety Board shall have exclu-

sive jurisdiction, and rules, regulations, or policies of the commission on the same subject have no force or effect."

The employers argue that this provision precludes the commission from enacting regulations on any matter upon which the Industrial Safety Board, i.e., Cal/OSHA has the authority or jurisdiction to act. Since, as the employers maintain, the governing statutes and judicial precedents clearly provide that Cal/OSHA has broad authority to act to protect workers' health and safety (see §§ 6305-6307; *Carmona* v. *Division of Industrial Safety* (1975) 13 Cal.3d 303, 312-313 [118 Cal.Rptr. 473, 530 P.2d 161]) the employer reasons that the IWC lacks any power to act in this field. The IWC, by contrast, asserts that while the 1973 amendment of section 1173 grants Cal/OSHA the "last word" on matters within its jurisdiction, the statute does not inhibit the IWC from acting to protect employees' health and safety in areas in which no conflict with Cal/OSHA regulations or policies actually exist.

In resolving this question of statutory interpretation, we begin with a brief historical review of the two agencies' overlapping jurisdiction in matters of employee health and safety. Since its inception as an entity charged with the regulation of wages, hours and working conditions of women and children, the IWC has been statutorily mandated "to investigate the comfort, health, safety, and welfare of such employees" and to fix wages, hours and working conditions so as to maintain and protect the "health and welfare" of such employees. (Stats. 1913, ch. 324, §§ 3, 6, pp. 633, 634-635.) From its earliest days, the commission's regulatory orders have contained numerous provisions aimed directly at preserving and promoting the health and safety of employees within its jurisdiction, and numerous decisions throughout the commission's existence have clearly recognized the validity of the commission's regulation of such matters. (See, e.g., *Kerr's Catering Service* v. *Department of Industrial Relations* (1962) 57 Cal.2d 319, 324-325 [19 Cal.Rptr. 492, 369 P.2d 20]; 2 Ops.Cal.Atty.Gen. 456 (1943); 6 Ops. Cal.Atty.Gen. 193, 194 (1945); 20 Ops.Cal.Atty.Gen. 120, 122 (1952).)

Despite its broad authority in this field, however, the IWC has never been the only state agency to regulate matters relating to the health and safety of California employees. In 1913, the year of the establishment of the IWC, the Legislature enacted a separate bill creating the Industrial Accident Commission, and vested that body, inter alia, with broad authority to adopt regulations relating to the safety and welfare

of employees. (Stats. 1913, ch. 176, §§ 51-72, pp. 305-311.) Unlike the IWC, however, the Industrial Accident Commission's jurisdiction was not limited only to the protection of women or child workers, but encompassed the entire workforce. Subsequently, in 1945, the Industrial Accident Commission's broad authority to regulate safety in places of employment was transferred to a new body, the Industrial Safety Board. (Stats. 1945, ch. 1431, § 78, p. 2698.)

In view of the broad grant of authority in matters relating to occupational health and safety to both the IWC and the Industrial Safety Board, the question of overlapping jurisdiction of these two agencies has existed for many decades. Prior to 1973, however, no specific statutory provision attempted to reconcile this overlapping jurisdiction. In the absence of any such provision, the existing authorities determined that both of the agencies had "concurrent jurisdiction" over matters within their authority, and concluded that affected employers were required to comply with all applicable regulations of both agencies. (See, e.g., 20 Ops.Cal.Atty.Gen. 120, 122 (1952); 37 Ops.Cal.Atty.Gen. 31, 36 (1961); cf. *Orange County Air Pollution Control Dist.* v. *Public Util. Com.* (1971) 4 Cal.3d 945, 951-954 [95 Cal.Rptr. 17, 484 P.2d 1361].) When more than one agency's regulations applied to a particular activity, the employer was obligated to comply with the most stringent regulation. (See 37 Ops.Cal.Atty.Gen. 31, 36 (1961).)

As already noted, in 1973 the Legislature enacted a bill expanding the IWC's jurisdiction to include all California employees, men, women and children. In the same bill, the Legislature added to section 1173 a paragraph specifically addressing the question of the overlapping jurisdiction of the IWC and the Industrial Safety Board. It is the interpretation of this provision upon which the present controversy turns.[13] To reiterate, the relevant paragraph of section 1173 reads in full: "Before adopting any new rules, regulations or policies, the commission shall consult with the Industrial Safety Board to determine those areas and subject matters where the respective jurisdiction of the commission and the Industrial Safety Board overlap. In the case of such overlapping jurisdiction, the Industrial Safety Board shall have exclusive jurisdiction, and rules, regulations, or policies of the commission on the same subject have no force or effect."

---

[13]Although the employers argue that a separate 1973 enactment (Stats. 1973, ch. 993, §§ 11, 16, pp. 1919-1920), which renamed the Industrial Safety Board the California Occupational Safety and Health Standards Board and which included a provision stating that such board "shall be the only agency in this state authorized to

The employers contend that this provision was intended to resolve the question of overlapping jurisdiction by entirely eliminating the power of the IWC to regulate on any matter over which the Industrial Safety Board (i.e., Cal/OSHA) has jurisdiction, i.e., all matters of occupational health and safety. The IWC contends that the Legislature had a more modest goal in mind and simply intended to provide that, *in cases of conflict*, the regulations or policies of the Industrial Safety Board would govern.

Viewed in isolation, the language of the paragraph in question is somewhat ambiguous. On the one hand, the paragraph's reference to the "exclusive jurisdiction" of the Industrial Safety Board appears to support the employers' reading of the provision. On the other hand, however, the statutory requirement of consultation between the two agencies would be rather pointless if the IWC had absolutely no authority to act with respect to health and safety matters in any circumstances. Moreover, the concluding language of the paragraph, declaring that "rules, regulations or policies of the commission *on the same subject* have no force or effect," suggests that the Legislature may well have intended that IWC orders would be preempted only when the In-

adopt occupational safety and health standards" (§ 142.3), was intended by the Legislature to give additional content to the 1973 amendment of section 1173, we think that that contention is belied both by the language of the section 1173 amendment and by its legislative history. As we have noted, the amendment of section 1173 refers to the "Industrial Safety Board" not the Occupational Safety and Health Standard Board and thus it is clear that, contrary to the employers' contention, the amendment of section 1173 was by no means a "companion" to the Cal/OSHA legislation. Second, as originally introduced, the paragraph of section 1173 in question provided that the *IWC*, rather than the Industrial Safety Board, would have "exclusive jurisdiction" in cases of conflict; although the position of the two agencies in the section 1173 paragraph was ultimately reversed, the legislation was not part of any comprehensive legislative design to give the newly constituted Cal/OSHA sole authority in this area.

Similarly, a review of Cal/OSHA legislation also suggests that the provisions of section 142.3 were not intended to affect the IWC's jurisdiction. Unlike section 1173, which specifically addresses the issue of the overlapping jurisdiction of the IWC and the Industrial Safety Board (Cal/OSHA), section 142.3 makes no reference to the IWC at all. Although that section provides that Cal/OSHA shall be the only agency to adopt "occupational safety and health standards," that terminology is a term of art specifically defined by the Cal/OSHA legislation (see § 6305, subd. (a)) and does not encompass wage orders promulgated by the IWC. Indeed, another provision of the Cal/OSHA legislation, section 144, subdivision (e), specifically provides that "[n]othing in this section shall affect or limit the authority of any state or local agency as to any matter other than the enforcement of occupational safety and health standards adopted by the board...."

Since the Legislature specifically enacted the amendment to section 1173 to address the question of the overlapping jurisdiction of the IWC and the Industrial Safety Board (Cal/OSHA), we conclude that we must properly look to that statute to determine legislative intent as to the proper allocation of authority between the two agencies.

dustrial Safety Board, i.e., Cal/OSHA, has actually regulated on the same subject.

Although the paragraph at issue, standing alone, is thus arguably susceptible to either of the interpretations proffered by the parties, for a number of reasons we conclude that the construction suggested by the IWC is the more reasonable and should be adopted.

First, and most significantly, numerous other provisions of the 1973 bill in which the paragraph in question appears are entirely incompatible with the employers' proposed interpretation. (See Stats. 1973, ch. 1007, §§ 1.5, 2, 3, pp. 2002-2003.) To begin with, as reenacted in 1973, the first paragraph of section 1173, immediately preceding the paragraph relied upon by the employers, provides explicitly that "[i]t shall be the continuing duty of the Industrial Welfare Commission...to investigate the comfort, *health, safety* and welfare of...employees." (Italics added.) In addition, the 1973 legislation also explicitly retained the provisions of section 1178, declaring that "wage board[s] shall report and make recommendations to the commission, including therein: (a) An estimate of the minimum wage adequate to supply the necessary cost of proper living to, and *maintain the health* and welfare of employees ...; (b) The number of hours of work per day...consistent with *the health* and welfare of employees; (c) The standard conditions of labor ...demanded by *the health* and welfare of employees." Finally, the 1973 act, while revising section 1182 in several respects, reiterated the portion of that section authorizing the IWC to fix "the standard conditions of labor demanded by the *health* and welfare of the employees ...in this state."

If the Legislature, by its 1973 enactments, had in fact intended to preclude the commission from acting with respect to matters of employee health and safety, as the employers suggest, it clearly would not have explicitly mandated the commission "to investigate the...health [and] safety of...employees" and would not have continued to authorize the commission to establish "standard conditions of labor demanded by the health...of [such] employees." A cardinal principle of statutory construction, of course, decrees that all related statutory provisions must be read together and harmonized, if possible. (See, e.g., *Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230-231 [110 Cal. Rptr. 144, 514 P.2d 1224].) In this case, a reading of the 1973 enactment as a whole indicates that, contrary to the employers' contention, the Legislature contemplated that the IWC would retain authority to

protect workers' health and safety, supporting the IWC's position that the statute simply requires the IWC to yield to the Industrial Safety Board (Cal/OSHA) in instances of actual conflict.

Second, the IWC's reading of the statute is supported by the fact that both of the administrative agencies charged with administering the legislation in question agree that this is the appropriate construction to be given the statutory language. Since the enactment of the 1973 legislation, the IWC and Cal/OSHA have consulted on numerous occasions pursuant to the provision of section 1173, and as a result of these consultations, the IWC has deleted from its wage orders a number of long-standing provisions on various subjects (e.g., protective garments and equipment, sanitary conditions of toilets and floors) over which Cal/OSHA has assumed jurisdiction. As the employers concede, however, throughout this period the officials of both Cal/OSHA and the IWC have taken the position that the IWC is not totally precluded from regulating on matters relating to worker health or safety, but may adopt such regulations so long as they do not conflict with applicable Cal/OSHA directives or policy. We have often said, of course, that "the construction of a statute by officials charged with its administration...is entitled to great weight" (*Morris* v. *Williams* (1967) 67 Cal. 2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697]) and this principle applies with particular strength when two agencies agree as to the interpretation of a statutory provision concerned with the allocation of authority between the agencies.

Finally, the interpretation of the statute urged by the IWC is sustained by the general principle of statutory interpretation, noted at the outset of this opinion, that remedial legislation of this nature is to be liberally construed in favor of accomplishing the principal objective of the legislation, i.e., protecting workers. Under the employers' interpretation of the statute, employees would be deprived of the benefits of health- and safety-related regulations of the IWC even though Cal/OSHA had not yet acted on the subject to protect the workers' interests. Such a construction is clearly at odds with the remedial purpose of the entire statutory framework.

Contrary to the employers' claim, the IWC's interpretation of the provision in no way deprives the relevant statutory provisions of section 1173 of all meaning. Unlike the situation prior to 1973, under the new statute employers need not comply with the most restrictive regulation when IWC and Cal/OSHA regulations collide; instead, the statute

provides that in such a situation, the regulations promulgated by Cal/OSHA will prevail.

Accordingly, we conclude that IWC retains jurisdiction to regulate working conditions related to the health and safety of employees in the absence of any actual conflict with existing Cal/OSHA regulations or policy. Because the record establishes that no such conflict exists, we reject the employers' challenge to the orders' validity on this ground.

6. *Neither federal nor state labor relation legislation precludes the IWC from establishing minimum wages, maximum hours or standard conditions of employment to protect the health and welfare of California employees.*

A number of employers additionally contend that a variety of state and federal labor relation statutes, which have as a principal objective the resolution of employer-employee disputes over wages, hours and working conditions through the collective bargaining process, operate to "preempt" the IWC from "imposing" or "dictating," upon either employers or employees, conditions of employment that have not been arrived at through collective bargaining.[14] Relying upon a number of labor law decisions which have indicated in other contexts that neither the National Labor Relations Board nor similar state agencies may "impose [their] own views of a desirable settlement" in the event of a dispute over employment conditions (see, e.g., *Porter Co. v. NLRB* (1970) 397 U.S. 99, 103-104 [25 L.Ed.2d 146, 151, 90 S.Ct. 821]; *Machinists v. Wisconsin Emp. Rel. Comm'n* (1976) 427 U.S. 132, 153 [49 L.Ed.2d 396, 411, 96 S.Ct. 2548]), the employers maintain that the IWC lacks authority to "interfere" with the collective bargaining process by mandating minimum permissible employment conditions in matters that are "mandatory subjects" of collective bargaining under the applicable labor statutes.

---

[14]In the underlying mandate actions, the employers have raised this issue with respect to the provisions of the California Agricultural Labor Relations Act (ALRA) (§ 1140 et seq.) which guarantee collective bargaining rights in the agricultural sector. Because (1) the ALRA's provisions in this regard were modeled upon the provisions of the National Labor Relations Act (NLRA) (see, e.g., *Vargas v. Municipal Court* (1978) 22 Cal.3d 902, 910-911 [150 Cal.Rptr. 918, 587 P.2d 714]), (2) many of the lawsuits challenging the 1976 orders raised an analogous issue with respect to the federal labor legislation, and (3) one of the issues specifically left open in *California Hotel & Motel Assn.* concerned the alleged preemptive effect of federal labor laws (25 Cal.3d at p. 205, fn. 2), we believe it is appropriate to analyze this issue with reference to both state and federal labor legislation. Although the employers have objected to the court's addressing and discussing the federal labor preemption issue in this proceeding, all par-

Taken at face value, the employers' contentions in this regard would have the effect of precluding the IWC from regulating with respect to *any* of the matters within its jurisdiction. Under each of the labor statutes which apply to the industries regulated by the commission—the National Labor Relations Act (NLRA) (29 U.S.C. § 151 et seq.), the Railway Labor Act (RLA) (45 U.S.C. § 151 et seq.), and the Agricultural Labor Relations Act (ALRA) (§ 1140 et seq.)—"wages, hours and working conditions" constitute mandatory subjects of collective bargaining. Thus, if these labor statutes in fact prohibited all governmental regulation on any matter that is subject to employee-employer bargaining, neither the IWC nor any other state or federal agency would have authority to prescribe minimum wages or maximum hours, to promulgate occupational health and safety standards, or to prohibit discriminatory employment practices. The mere recitation of the logical consequences of the employers' argument, of course, signals the extreme tenuousness of the employers' contention.

In fact, the fundamental flaw in the employers' present argument was fully exposed nearly 30 years ago by Justice Jackson in his opinion for the United States Supreme Court in *Terminal Assn.* v. *Trainmen* (1943) 318 U.S. 1 [87 L.Ed. 571, 63 S.Ct. 420]. In *Terminal*, an employer covered by the Railway Labor Act challenged the validity of a state agency regulation which, to protect the health and safety of employees, required the company to provide cabooses on designated railroad runs. The employer in *Terminal* pointed out that the state regulation conflicted with a specific provision of a collective bargaining agreement that had been negotiated between the employer and employees, and argued that since the question of providing cabooses involved a working condition of the employment and thus was a "mandatory subject" of collective bargaining subject to resolution under the Railway Labor Act, state regulation on the subject was preempted by the act.

In *Terminal*, the Supreme Court unanimously rejected the employer's contention and upheld the validity of the state regulation. In reaching this conclusion, Justice Jackson explained: "The Railway Labor Act, like the National Labor Relations Act, does not undertake governmental regulation of wages, hours, or working conditions. Instead it seeks to provide a means by which agreement may be reached with respect to them. The national interest expressed by those Acts is not primarily in the working conditions as such. . . .

ties were notified prior to oral argument of this court's intention to consider the issue, and both sides have filed briefs directed to this issue.

"State laws have long regulated a great variety of conditions in transportation and industry, such as sanitary facilities and conditions, safety devices and protections, purity of water supply, fire protection, and innumerable others. Any of these matters might, we suppose, be the subject of a demand by workmen for better protection and upon refusal might be the subject of a labor dispute which would have such effect on interstate commerce that federal agencies might be invoked to deal with some phase of it. But we would hardly be expected to hold that the price of the federal effort to protect the peace and continuity of commerce has been to strike down state sanitary codes, health regulations, factory inspections, and safety provisions for industry and transportation. We suppose employees might consider that state or municipal requirements of fire escapes, fire doors, and fire protection were inadequate and make them the subject of a dispute, at least some phases of which would be of federal concern. But it cannot be that the minimum requirements laid down by state authority are all set aside. We hold that the enactment by Congress of the Railway Labor Act was not a preemption of the field of regulating working conditions themselves and did not preclude the State . . . from making the order in question." (Fn. omitted.) (318 U.S. at pp. 6, 7 [87 L.Ed. at pp. 577-578].)

This reasoning, we believe, fully answers the employers' contention that federal or state labor legislation, fostering collective bargaining, can be read to preempt legislative efforts to prescribe minimum standards of wages, hours and working conditions for the protection of employees. Indeed, as already suggested, the numerous existing federal and state statutes embodying just such "minimum standards" stand as eloquent testimony to the validity of such regulation. Thus, notwithstanding the NLRA and the RLA, the federal government has enacted the Fair Labor Standards Act of 1938 (29 U.S.C. § 201 et seq.) prescribing minimum wages and maximum hours, and the Occupational Safety and Health Act of 1970 (federal OSHA) (29 U.S.C. § 651 et seq.), authorizing the promulgation of specific standards directly relating to workers' conditions of employment. Moreover, both the Fair Labor Standards Act and federal OSHA contain specific provisions which recognize the states' authority to go beyond the federal legislation in adopting more protective regulations for the benefit of employees. (29 U.S.C. § 218; 29 U.S.C. §§ 651 (b)(11), 667.)

Furthermore, although the employers argue that state regulation in this field—if permissible at all—must be confined only to matters of minimum wages, maximum hours or working conditions which directly

implicate the health or safety of employees, federal and state legislation directed to discrimination in employment demonstrates that governmental entities retain broad authority to establish minimum standards related generally to the "welfare" of employees. (See, e.g., 42 U.S.C. §§ 2000e-2, 2000e-7; Lab. Code, § 1410 et seq.)[15]

As the *Terminal* case teaches, the fact that these matters may also constitute proper, indeed "mandatory," subjects of collective bargaining does not preclude the state from adopting minimum standards to protect the welfare of workers who may not enjoy sufficient bargaining strength to obtain adequate protection from their employers at the bargaining table.[16]

---

[15]To the extent that the case of *United Air Lines* v. *Industrial Welfare Com.* (1963) 211 Cal.App.2d 729, 744 [28 Cal.Rptr. 238], supports the contention that state regulation of working conditions is invalid outside the realm of health and safety provisions, that decision is disapproved. Numerous legislative enactments and judicial authorities make it clear that the states possess broad authority, under their police power, to prescribe minimum standards of employer conduct found necessary to protect the *welfare* of employees, even when health or safety considerations are not directly implicated. (See, e.g., 42 U.S.C. § 2000e-7 (recognizing validity of state antidiscrimination provisions); 15 U.S.C. § 1677 (recognizing validity of state laws prohibiting discharge on basis of wage garnishments); Lab. Code, § 1101 et seq. (prohibiting employer interference with employees' political activities or affiliations); *De Canas* v. *Bica* (1976) 424 U.S. 351, 356 [47 L.Ed.2d 43, 49, 96 S.Ct. 933]; *Baltimore & O. R. Co.* v. *Commonwealth, Dept. of L. & I.* (1975) 461 Pa. 68 [334 A.2d 636, 643], app. dism. for want of substantial federal question, 423 U.S. 806 [46 L.Ed.2d 26, 96 S.Ct. 14].)

[16]The numerous labor law preemption decisions relied upon by the employers are clearly not in point. None of the decisions dealt with a state regulation prescribing a minimum standard for working conditions to protect the health, safety or welfare of employees. Instead, the cases involve either direct state interference with the collective bargaining process (see, e.g., *California* v. *Taylor* (1957) 353 U.S. 553 [1 L.Ed.2d 1034, 77 S.Ct. 1037]) or with the choice of economic weapons available during a labor dispute (see, e.g., *Machinists* v. *Wisconsin Emp. Rel. Comm'n, supra,* 427 U.S. 132), or the state's use of its antitrust laws to bar the collective action by employees or employers protected by federal law. (See, e.g., *Teamsters Union* v. *Oliver* (1959) 358 U.S. 283 [3 L.Ed.2d 312, 79 S.Ct. 297].) As the United States Supreme Court recently observed: "[A]lmost all of the Court's labor law decisions in which state regulatory schemes have been found to be preempted have involved state efforts to regulate or to prohibit private conduct that was either protected by § 7 [of the NLRA], prohibited by § 8 [of the NLRA], or at least arguably so protected or prohibited." (*New York Tel. Co.* v. *New York Labor Dept.* (1979) 440 U.S. 519, 529 [59 L.Ed.2d 553, 561-562, 99 S.Ct. 1328] (fns. omitted).)

Contrary to the employers' contention, the Supreme Court has never retreated from its holding in *Terminal,* quoted above, that the federal labor laws do not "preempt [ ] ...the field of regulating working conditions...." (318 U.S. at p. 7 [87 L.Ed.2d at p. 578]. See, e.g., *Malone* v. *White Motor Corp.* (1978) 435 U.S. 497, 504-505, 512 [55 L.Ed.2d 443, 450-451, 455, 98 S.Ct. 1185]; *Baltimore & O. R. Co.* v. *Commonwealth, Dept. of L. & I., supra,* 334 A.2d 636, app. dism. for want of a substantial federal question, 423 U.S. 806.)

Accordingly, we conclude that existing federal and state labor statutes establish no bar to the IWC's promulgation of the 1980 wage orders. (See, e.g., *Rivera* v. *Division of Industrial Welfare, supra*, 265 Cal.App.2d 576, 602-604.)

7. *The employers' additional, individual challenges to specific provisions in various wage orders are without merit.*

Finally, in addition to raising the numerous common legal challenges to the 1980 wage orders discussed at length above, a number of employers have put forward a variety of more limited objections to specific provisions of one or more of the various 1980 wage orders. As we shall explain, we have also concluded that none of these additional contentions has merit.

(a) *Treatment of tipped employees in wage order 5-80.*

■ In the Kings County action (see fn. 2, *ante*), a number of employers argue that in enacting wage order 5-80, relating to the public housekeeping industry, the IWC abused its discretion in refusing to provide a lower minimum wage for tipped employees. The IWC explained the basis of its decision in the statement as to the basis for order 5-76 which it adopted upon remand of this court's decision in *California Hotel & Motel Assn.* The commission stated: "Many requests were received from the hotel and restaurant industry for a special, lower rate for tipped employees. The Commission carefully studied written and oral arguments on the matter. It denied the request, however, for two reasons. First, and most important, the Legislature specifically revoked the authority it had earlier given the IWC to allow credit for tips against the minimum wage, when it amended Section 351 of the Labor Code this year [i.e., 1975]. Second, the Commission noted from enforcement experience during the time that tip credit was allowed that tip sharing was required to such an extent that the traditional tipped employees were subsidizing the minimum wages of other classifications."

The employers contend that the IWC has misinterpreted the effect of the 1975 amendment to section 351,[17] asserting that while the Legisla-

---

[17]Prior to 1975, section 351 provided in relevant part: "No employer...shall... receive any gratuity or a part thereof, paid, given to or left for an employee by a patron, or deduct any amount from wages due an employee on account of such gratuity ...*except to the extent that may be permitted by a valid regulation of the Industrial*

ture intended by such amendment to prohibit the IWC from allowing employers directly to deduct from an employee's wages tips that an employee actually receives, the Legislature did not intend to prohibit the commission itself from indirectly achieving a somewhat comparable result by establishing a lower minimum wage for tipped employees. Although the tip credit practice sanctioned by the IWC in the past may have engendered particular abuse because individual employers exacted credit from their employees on an individual basis, we think that the legislative history of the 1975 bill supports the IWC's conclusion that the Legislature contemplated that the enactment would insure that tips received by an employee would not reduce an employer's minimum wage obligation, either directly or indirectly.

For example, an analysis of the 1975 bill by the Senate Industrial Relations Committee specifically states: "The effect of this bill would be to require employers to pay employees at least the minimum wage regardless of the amount of tips the employees receive." Similarly, a memorandum on the legislation drafted by the Assembly Labor Relations Committee states in part: "The basis for this legislation would appear to be that tips or gratuities are given for individual excellence of service above and beyond the basic duties of employment, and as such, the employer has no vested right to consider tips a part of wages." In light of the legislative history, the IWC could reasonably interpret the amendment of section 351 as a legislative determination that all employees should be guaranteed a minimum wage that is not reduced by virtue of any tips an employee may possibly receive. As already noted, the commission's interpretation of the statutes which it administers is entitled to great weight, and, in our view, the employers have not demonstrated a sufficient basis for rejecting the commission's interpretation of this provision.

The employers additionally contend, however, that as interpreted by the commission, section 351 violates equal protection principles by creating an arbitrary distinction between tipped and nontipped employees. We do not agree. The Legislature could rationally determine (1) that, for minimum wage purposes, employers should not receive the benefits of gratuities that customers intend for the sole benefit of employees and (2) that employers should not be excused from the obligation of paying minimum wages to certain employees upon the uncertain possibility

---

*Welfare Commission....*" (Italics added.) In 1975, section 351 was amended to delete the italicized language of the statute.

that such employees will in fact receive a predetermined amount of tips for their services. (See generally *Cal. Drive-in Restaurant Assn.* v. *Clark* (1943) 22 Cal.2d 287, 295-300 [140 P.2d 657, 147 A.L.R. 1028]; *Williams* v. *Terminal Co.* (1942) 315 U.S. 386, 388-389 [86 L.Ed. 914, 920-921, 62 S.Ct. 659]; *id.*, at pp. 410-411 [86 L.Ed. at pp. 931-932] (Black, J. dis.).) Although the employers also claim that the absence of a lower minimum wage for tipped employees is arbitrary in light of the credits which employers are given for other "non-wage benefits," e.g., meals provided by the employer, there is an obvious distinction between the two categories of "non-wage benefits" in that the employer makes a direct out-of-pocket expenditure for meals and the like, whereas tips are paid by customers, not the employer.

Accordingly, we conclude that the minimum wage provisions of wage orders 5-80 are not invalid in failing to provide a differentiated minimum wage for tipped and nontipped employees.

(b) *"Due process" challenge to orders 8-80, 13-80 and 14-80.*

In the Stanislaus County case, numerous agricultural employers contend that the 1980 wage orders regulating agricultural industries violate due process, asserting in conclusory terms that the orders impose such "inflexible overtime and work rules [that] many such employers will not be able to operate efficiently or economically [and]...will be forced out of business." The employers additionally contend that in evaluating the constitutionality of the wage order provisions, the judiciary should exercise de novo review because the regulation may deprive the growers of the right to practice a common occupation.

As the IWC suggests, the employers' contentions in this regard fly in the face of a long line of contrary authority. From at least as early as the United States Supreme Court decision in *West Coast Hotel Co.* v. *Parrish* (1937) 300 U.S. 379 [81 L.Ed. 703, 57 S.Ct. 578, 108 A.L.R. 1330], sustaining the constitutionality of a state minimum wage law in the face of a similar due process challenge, the cases have made clear that state regulations of minimum wages, maximum hours and working conditions come to the courts "freighted with [a] strong presumption of regularity" (*Ralphs Grocery Co.* v. *Reimel* (1968) 69 Cal.2d 172, 175 [70 Cal.Rptr. 407, 442 P.2d 79]) and are not subject to "de novo" judicial review. As the court emphasized in *West Coast Hotel*: "'[T]imes without number we have said that the legislature is primarily the judge of the necessity of such an enactment, that every

possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power.'" (300 U.S. at p. 398 [81 L.Ed. at p. 712].)

■ Moreover, the authorities similarly declare that the "legislative power" to regulate employment conditions is very broad indeed, even though such regulations almost inevitably impose some economic burden upon employers. Again, as the Supreme Court stated in *West Coast Hotel*: "In dealing with the relation of employer and employed, the legislature has necessarily a wide field of discretion in order that there may be suitable protection of health and safety, and that peace and good order may be promoted through regulations designed to insure wholesome conditions of work and freedom from oppression." (*Id.*, at p. 393 [81 L.Ed. at p. 709].) The employers completely fail to show that the wage and hours regulations they attack are not rationally related to these permissible state interests.

Indeed, although the agricultural employers complain about the harshness of the wage orders applicable to their industry, the fact of the matter is that the wage order relating to agriculture appears to be particularly solicitous of the interests of agricultural employers in several respects. Thus, for example, wage order 14-80 provides for a longer work week for agricultural employees (ten-hour day, six-day week) before the overtime premium applies, exempts growers from the requirement of providing specific places for meal periods, changing rooms or rest facilities, and imposes no temperature restrictions.

(c) *"Undue hardship"*

■ In a corollary to the above "due process" argument, the agricultural employers argue that orders 8-80, 13-80 and 14-80 are invalid because they impose an "undue hardship" on employers in violation of a provision of the 1973 legislation which reads: "It is the intent of the Legislature in enacting this act that the Industrial Welfare Commission interpret these provisions in a manner which does not cause undue hardship or loss of employment opportunities in any segment of industry in California." (Stats. 1973, ch. 1007, § 11, p. 2005.)

As already noted, however, the 1980 agricultural wage orders give full consideration to the interests of both *employees* and *employers*, and provide numerous exemptions—where the IWC found it appropriate—

in recognition of the commission's responsibility to avoid "undue hard-ship" to all affected individuals. The statutory language to which the employers point makes it clear that the "undue hardship" provision was not intended to grant courts the prerogative of usurping the agency's quasi-legislative function; the statute directs the *IWC* to interpret the provision so as to forestall undue hardship. The employers fail to dem-onstrate that the commission failed to give heed to the guidance of this provision.

### (d) *Alleged conflict with section 554*

 The agricultural employers additionally contend that section 3(A) of orders 8-80 and 13-80 conflict with section 554 and are invalid. Section 3(A)(1) of each of these orders requires that employees in the covered industries be given a twenty-four-hour period off after they have worked seventy-two hours in any seven-day period;[18] the employers contend that this requirement is inconsistent with the provisions of sec-tion 554 which exempt agricultural employees from section 551's statu-tory requirement of one day's rest in seven.[19]

The employers' contention rests upon a fundamental misconception of the relationship between the general statutory provisions of sections 510-556 and the more specific regulations embodied in IWC wage or-ders. Although section 1182 expressly provides that the maximum hours fixed by IWC wage orders "shall not *be more than* the maximum for employees in California" (italics added), the authorities have uniformly held that "the Industrial Welfare Orders may provide *more restrictive provisions* than are provided by [the general] statutes adopted by the Legislature on this subject [in sections 510-556] . . . ." (Italics added.) (2 Ops.Cal.Atty.Gen. 456, 457 (1943); accord *Cal. Drive-in Restaurant Assn.* v. *Clark, supra*, 22 Cal.2d 287, 290-294; cf. § 1356; *Rivera* v. *Di-vision of Industrial Welfare, supra*, 265 Cal.App.2d 576, 599-601.) Thus, in the opinion cited above, the Attorney General rejected a con-tention, similar to that raised by the employers in the instant case, that

---

[18]Section 3(A)(1) reads in relevant part: "An employee may work up to a maximum of seventy-two (72) hours in any seven (7) consecutive days after which the employee shall have a twenty-four hour period off duty."

[19]Section 551 provides: "Every person employed in any occupation of labor is entitled to one day's rest therefrom in seven."

Section 554 provides in part: "This chapter shall not apply to any cases of emer-gency nor to work performed in the necessary care of animals, crops or agricultural lands . . . ."

the provisions of section 556—exempting certain employees from the statutory mandate of section 551—operated to preclude the IWC from requiring employers to afford such employees one day's rest in seven. (2 Ops.Cal.Atty.Gen. 456, 458 (1943).)

Moreover, this conclusion is reinforced in the instant case by the fact that the sections of the 1980 wage orders challenged by the employers have been part of the wage orders of the industries in question since 1943. As the Court of Appeal noted in *Rivera* about a similar wage order provision: "This long-continued and consistent administrative interpretation has received at least silent acquiescence from the Legislature. It supports the interpretation that the statutory [provisions]... should not be construed to prevent it. The courts will not depart from such an administrative construction unless it is clearly erroneous or unauthorized." (Fn. omitted.) (265 Cal.App.2d 576, 601.)

(e) *Alleged conflict with section 1394, subdivision (a).*

Finally, the agricultural employers contend that section 3(c) of order 13-80, regulating the hours of employment of minors, conflicts with section 1394, subdivision (a) and is invalid. As the IWC's replication points out, however, the employer's argument rests entirely upon an outdated version of section 1394, subdivision (a) and completely ignores recent amendments to section 1394 and the enactment of section 1394.1. The employers have not demonstrated that the 1980 wage orders conflict with the currently prevailing statutes.

8. *Conclusion.*

We are aware of the vexation that the managements of many regulated corporations must feel as to the multiple controls an administrative society is compelled to impose upon them. Perhaps this extensive regulation is the price we pay for the very life of a society based upon the conglomerate and the mass producer. Yet the incidence of such control hopefully should not endanger the very continuance of those fundamental protections of the workers that trace back over a half century and that the Legislature and responsible administrative officials have determined to be necessary to the workers' welfare. The likely chagrin of the regulated should not obscure the underlying social need that prompts the regulation.

For the reasons discussed at length above, we conclude that none of the employers' challenges to the IWC's 1980 wage orders has merit.

Let a peremptory writ of mandate issue, directing the respondent courts (1) to vacate the orders previously issued staying the operation and effect of the challenged wage orders and (2) to enter judgment in favor of the commission in each of the underlying mandate actions. The commission shall recover its costs in this proceeding.

Clark, J., Richardson, J., Manuel, J., Newman, J., Taylor, J.,* and Racanelli, J.,* concurred.

The petition of real party in interest California Trucking Association for a rehearing was denied August 28, 1980, and the judgment was modified to read as printed above. Bird, C. J., and Mosk, J., did not participate therein.

---

*Assigned by the Chairperson of the Judicial Council.