Filed 4/22/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JUAN RODRIGUEZ,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>E.M.E., INC.,<br><br>      Defendant and Respondent. | B264138<br>(Los Angeles County<br>Super. Ct. No. BC518692) |

APPEAL from an order of the Superior Court of Los Angeles County, John Shepard Wiley, Judge. Affirmed in part, reversed in part, and remanded for further proceedings.

Rastegar Law Group, Farzad Rastegar and Joshua N. Lange for Plaintiff and Appellant.

Carlson & Jayakumar, Keith W. Carlson, Christine De Bretteville and Jamie D. Mayorga for Defendant and Respondent.

Seyfarth Shaw, Jeffrey A. Berman and Kiran A. Seldon for California Hospital Association; Civil Justice Association of California; California Association of Health Facilities; and The California Retailers Association as Amicus Curiae on behalf of Defendant and Respondent.

_____

In the underlying action, appellant Juan Rodriguez asserted putative class claims against respondent E.M.E., Inc. (E.M.E.) for violations of the Labor Code, Industrial Welfare Commission (IWC) Wage Order No. 1-2001 (Wage Order 1-2001), and the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.). After granting appellant's motion for class certification, the trial court granted E.M.E.'s motion for summary judgment on appellant's claims, which relied on *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1026 (*Brinker*). We conclude that summary judgment was incorrectly granted with respect to appellant's claims relating to rest breaks, as *Brinker* explained that under the applicable wage order provision, rest breaks in an eight-hour shift should fall on either side of the meal break, absent factors rendering such scheduling impracticable. We therefore affirm in part, reverse in part, and remand for further proceedings.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

There are no material disputes regarding the following facts: E.M.E. is a family-owned metal finishing company that has been in business since 1962, and engages primarily in aerospace work. After receiving metal parts made by machine shops, E.M.E. inspects the parts, processes them to increase their longevity, paints them, and returns them to their makers. E.M.E. has a single

facility located in Compton, and has 125 employees, of which 121 are paid on an hourly basis.

E.M.E. employed appellant for periods between 1995 and 2013. Appellant initially worked as a painter in the paint department. Later, he acted as a shift supervisor until February 2013, when he resumed his former role as a painter. In the course of his employment, he worked on the first shift (from 7:30 a.m. to 4:00 p.m.) and the second shift (from 3:30 p.m. to 11:30 p.m.). During the first shift, employees received a 20-minute rest break at 9:30 or 9:40 a.m., and a 30-minute meal break at 12:30 p.m.; during the second shift, they received a 30-minute meal break at 5:30 p.m. and a 20-minute rest break at 8:00 p.m. In May 2013, appellant ended his employment at E.M.E.

Appellant's class action complaint, filed August 16, 2013, contained claims under the Labor Code, the UCL, and Wage Order No. 1-2001, which obliges employers to provide a 30-minute meal period "for a work period of more than . . . []5[] hours," and rest periods accruing "at the rate of . . . []10[] minutes per . . . []4[] hours or major fraction thereof" (Cal. Code Regs, tit. 8, §§ 11010(11)(A), 11010 (12)(A)). The complaint's first and second causes of action asserted that appellant had failed to provide meal and rest breaks (Lab. Code, §§ 226.7, 512). Underlying those claims were allegations that E.M.E. had contravened Wage Order 1-2001 by failing to supply the requisite 30-minute meal breaks and compelling employees "to take a single, combined rest period . . . ." The complaint's remaining claims (the third through seventh causes of action) were for failure to pay minimum wages, overtime compensation, and wages due (Lab. Code, §§ 201-204, 226, 510, 1194, 1197), failure to provide accurate pay statements (Lab. Code, §§ 226, 1174, 1174.5), and unfair business practices under the UCL. The complaint sought compensatory damages and penalties.

3

In December 2014, relying primarily on *Brinker, supra,* 53 Cal.4th at p. 1026, E.M.E. sought summary judgment or adjudication on the complaint with respect to appellant's claims as an individual. E.M.E. requested summary adjudication on the first cause of action, contending that appellant always had been permitted 30-minute meal breaks. E.M.E. also requested summary adjudication on appellant's second cause of action, contending that E.M.E.'s practice of providing a "combined" 20-minute rest period before or after the meal break (depending on the shift) was lawful. In light of the purported defects in the first and second causes of action, E.M.E. requested summary adjudication on the remaining "derivative" claims.

In February 2015, while E.M.E.'s motion for summary judgment or adjudication was pending, appellant filed a motion for class certification of the complaint's claims relating to the failure to provide rest breaks. After granting the motion for class certification, the trial court concluded that summary adjudication was proper with respect to appellant's first and second causes of action, and thus granted summary judgment with respect to his entire complaint. On March 5, 2015, the court entered a judgment in favor of E.M.E. dismissing the entire action with prejudice. This appeal followed.

## DISCUSSION

Appellant contends the trial court erred in granting summary judgment with respect to the claims relating to the provision of rest breaks. For the reasons discussed below, we agree.

4

A. *Standard of Review*

"A summary adjudication motion is subject to the same rules and procedures as a summary judgment motion. Both are reviewed de novo. [Citations.]" (*Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 819.) "A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. [Citation.]" (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107.) Generally, "the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) In moving for summary judgment, "all that the defendant need do is to show that the plaintiff cannot establish at least one element of the cause of action -- for example, that the plaintiff cannot prove element X." (*Id.* at p. 853, fn. omitted.)

Although we independently assess the grant of summary judgment, our inquiry is subject to two constraints. Under the summary judgment statute, we examine the evidence submitted in connection with the summary judgment motion, with the exception of evidence to which objections have been appropriately sustained. (*Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 711; Code Civ. Proc., § 437c, subd. (c).) The parties asserted numerous evidentiary objections to the showing proffered by their adversary. Because the trial court did not expressly rule on the objections, we presume them to have been overruled. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534

5

(*Google*).)  To the extent E.M.E. asserts an evidentiary objection on appeal, we discuss it below (see pt. D. of the Discussion, *post*).

Furthermore, our review is governed by a fundamental principle of appellate procedure, namely, that "'[a] judgment or order of the lower court is presumed correct,'"'" and thus, "'error must be affirmatively shown.'"  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 664, italics omitted, quoting 3 Witkin, Cal. Procedure (1954) Appeal, § 79, pp. 2238-2239.)  Under this principle, appellant bears the burden of establishing error on appeal, even though E.M.E. had the burden of proving its right to summary judgment before the trial court.  (*Frank and Freedus v. Allstate Ins. Co.* (1996) 45 Cal.App.4th 461, 474.)  For this reason, our review is limited to contentions adequately raised in appellant's briefs.  (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125-126.)

In view of that principle, the focus of our inquiry is on the claim relating to rest breaks.  E.M.E. sought summary adjudication separately with respect to appellant's meal break claim (the first cause of action) and his rest break claim (the second cause of action); furthermore, its motion for summary judgment -- insofar as it encompassed the meal break claim -- was predicated on the ground underlying the related request for summary adjudication.  In granting summary judgment, the court granted summary adjudication separately with respect to the meal break claim and the rest break claim.  Because appellant does not discuss the meal break claim, he has forfeited any contention of error that summary adjudication was improperly granted with respect to that claim.  (*Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1177; *Yu v. Signet Bank/Virginia* (1999) 69 Cal.App.4th 1377, 1398; *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6.)  Furthermore, as the parties do not dispute that the complaint's other claims (the third through seventh causes of action) are

6

"derivative," the propriety of summary judgment with respect to them hinges on the existence of triable issues regarding the rest break claim.

B. *Governing Principles*

Appellant's rest break claim relies on section 226.7 of the Labor Code and Wage Order No.1-2001.[1]  Subdivision (b) of section 226.7 provides:  "An employer shall not require an employee to work during a meal or rest or recovery period mandated pursuant to an applicable statute, or applicable . . . order of the [IWC]."  In 1913, the Legislature created the IWC, which was authorized to regulate the wages, hours, and working conditions of various classes of workers to protect their health and welfare.  (*Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 700-701 (*Industrial Welfare Com.*).)  To this end, the IWC promulgated so-called "wage orders," which prescribe "minimum requirements with respect to wages, hours, and working conditions" for workers in a number of industries and occupations.[2]  (*Id*. at p. 700.)  In developing the orders, the IWC collected evidence regarding working conditions, received recommendations and comments from affected individuals, and conducted public hearings.  (See *Industrial Welfare Com., supra,* 27 Cal.3d at pp. 704-705.)  Although the Legislature defunded the IWC in 2004, its orders remain in effect.  (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1102, fn. 4 (*Murphy*).)  As a consequence, "wage and hour claims are today governed by two

---

[1]    All further statutory citations are to the Labor Code, unless otherwise indicated.

[2]    The IWC was initially authorized to issue wage orders applicable only to women and children, but its jurisdiction was eventually extended to men in 1973. (*Industrial Welfare Com.*, *supra*, 27 Cal.3d at pp. 700-701.)

complementary and occasionally overlapping sources of authority: the provisions of the Labor Code, enacted by the Legislature, and a series of 18 wage orders, adopted by the IWC." (*Brinker, supra*, 53 Cal.4th at p. 1026.) Those laws and wage orders are also subject to enforcement by a state agency, namely, the Division of Labor Standards Enforcement (DLSE). (*Brinker, supra,* at pp. 1028-1029 & fn. 11.)

Here, the propriety of summary adjudication hinges on the extent to which Wage Order 1-2001 permits an employer to combine the rest periods required during an 8-hour work shift and provide them before or after the meal break. Generally, "[w]hen a wage order's validity and application are conceded and the question is only one of interpretation, the usual rules of statutory interpretation apply." (*Brinker, supra,* 53 Cal.4th at p. 1027.) The task of interpretation is to determine the legislative intent, looking first to the words of the wage order, construed in light of their ordinary meaning and statutory context. (*Gonzalez v. Downtown L.A. Motors, L.P.* (2013) 215 Cal.App.4th 36, 43.) "Judicial construction that renders any part of the wage order meaningless or inoperative should be avoided. [Citation.]" (*Id*. at p. 44.) When necessary to establish the wage order's meaning, "a court may consider '"a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." [Citation.]' [Citation.]" (*Ibid*., quoting *Aleman v. Airtouch Cellular* (2012) 209 Cal.App.4th 556, 568-569.) In this regard, "[t]he DLSE's opinion letters, '"""while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.""""' [Citation.]" (*Brinker*, *supra*, 53 Cal.4th at p. 1029, fn. 11, quoting

8

*Seymore v. Metson Marine, Inc.* (2011) 194 Cal.App.4th 361, 369, fn. 5, disapproved on another ground in *Mendiola v. CPS Security Solutions, Inc.* (2015) 60 Cal.4th 833, 846.)

Wage Order 1-2001, which is applicable to the manufacturing industry, contains provisions regulating working hours, minimum wages, and other matters, including meal and rest breaks.[3] (Cal. Code Regs., tit. 8, § 11010.) Regarding meal breaks, section 11(A) of the wage order states in pertinent part: "No employer shall employ any person for a work period of more than . . . []5[] hours without a meal period of not less than 30 minutes . . . ." Regarding rest breaks, section 12(A) provides: "Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof."

In *Brinker*, our Supreme Court examined the timing of meal and rest breaks under IWC Wage Order No. 5-2001 (Wage Order 5-2001) (Cal. Code Regs. tit. 8, § 11050), which is applicable to the public housekeeping industry, and contains provisions regarding rest breaks identical to those found in Wage Order 1-2001. (*Brinker*, *supra*, 53 Cal.4th at p. 1018 & fn. 1.) There, several restaurant employees sought class certification of their claims under that wage order for inadequate and mistimed meal and rest breaks. (*Id*. at pp. 1017-1021.) As the rulings before the Supreme Court concerned class certification, the court confined its determinations regarding the wage order's provisions to those necessary to assess whether class certification was proper. (*Id*. at pp. 1025-1026, 1028.)

---

[3]     We take judicial notice of Wage Order 1-2001.

9

In order to decide whether the employees had offered a theory of liability regarding rest breaks suitable for class certification, the court examined two aspects of the duty to provide rest breaks imposed under the wage order. (*Brinker*, *supra*, 53 Cal.4th at pp. 1028-1032.) Regarding the rate at which rest time must be permitted, the court concluded that the second sentence of section 12(A) of Wage Order 5-2001 defines the requisite amount of rest time "as the number of hours worked divided by four, rounded down if the fractional part is half or less than half and up if it is more . . . , times 10 minutes." (*Brinker, supra,* at p. 1029.)

The court also addressed the timing of rest breaks to the extent necessary to resolve the plaintiffs' contention that employers were required to provide a rest period before any meal break. (*Brinker*, *supra*, 53 Cal.4th at pp. 1030-1032.) The court rejected that contention, noting that the only constraint in section 12(A) of Wage Order 5-2001 was that "rest breaks must fall in the middle of work periods 'insofar as practicable.'" (*Brinker, supra,* at p. 1031.) The court stated: "Employers are . . . subject to a duty to make a good faith effort to authorize and permit rest breaks in the middle of each work period, but may deviate from that preferred course where practical considerations render it infeasible. At the certification stage, we have no occasion to decide, and express no opinion on, what considerations might be legally sufficient to justify such a departure." (*Ibid*.)

The court illustrated the contention's defect by reference to a hypothetical employee working a six-hour shift, who ordinarily would be entitled to a meal period and a single rest period: "Either the rest period must fall before the meal period or it must fall after. Neither text nor logic dictates an order for these, nor does anything in the policies underlying the wage and hour laws compel the conclusion that a rest break at the two-hour mark and a meal break at the four-hour mark of such a shift is lawful, while the reverse, a meal break at the two-hour mark

and a rest break at the four-hour mark, is per se illegal." (*Brinker, supra,* 53 Cal.4th at p. 1031, fn. omitted.)

In rejecting the employees' contention, the court discussed a DLSE opinion letter interpreting IWC Wage Order No. 16-2001 (Wage Order 16-2001) (Cal. Code Regs., tit. 8, § 11160), which applies to certain on-site occupations in the construction, drilling, logging, and mining industries.[4] The opinion letter addressed "the extent of employer flexibility" in scheduling rest breaks under that wage order. (Dept. Industrial Relations, DLSE Opn. Letter No. 2001.09.17 (Sept. 17, 2001), at p. 1.)[5] Responding to a hypothetical regarding an 8-hour shift in which the employer provides a 10-minute rest break at the 2-hour mark, a 10-minute rest break at the 4-hour mark, a 30-minute meal break at the 5-hour mark, and no further breaks, the DLSE opined that such a schedule would not comport with section 11(A) of Wage Order 16-2001, "absent truly unusual circumstances," as that section requires a rest break in the middle of each work period "'insofar as

---

[4]    We take judicial notice of Wage Order 16-2001 and the related DLSE opinion letter.

[5]    The DLSE noted that Wage Order 16-2001 affords employers greater flexibility regarding rest break scheduling (DLSE Opn. Letter No. 2001.09.17, *supra*, at p. 1), as the portion of the meal break provision italicized below does not appear in other wage orders (including Wage Orders 1-2001 and 5-2001). Section 11(A) of Wage Order 16-2001 states:  "Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. *Nothing in this provision shall prevent an employer from staggering rest periods to avoid interruption in the flow of work and to maintain continuous operations, or from scheduling rest periods to coincide with breaks in the flow of work that occur in the course of the workday.* The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time for every four (4) hours worked, or major fraction thereof."  (Italics added.)

11

practicable.'" (DLSE Opn. Letter No. 2001.09.17, *supra,* at p. 4.) Furthermore, responding to a hypothetical regarding the provision of one 20-minute combined rest break in the morning or afternoon, the DLSE opined that such a schedule is "never allowed under ordinary circumstances." (*Ibid*.)

In *Brinker*, the Supreme Court focused on the DLSE's opinion concerning the first hypothetical (the 8-hour shift involving two discrete rest breaks prior to the meal break), which relied on language commonly found in the meal break provisions of IWC wage orders, including Wage Order 5-2001. (*Brinker*, *supra*, 53 Cal.4th at p. 1031.) The court stated: "We have no reason to disagree with the DLSE's view regarding the scenario it considered, but that view does not establish universally the proposition that an employee's first rest break must always come sometime before his or her first meal break. Rather, in the context of an eight-hour shift, '[a]s a general matter,' one rest break should fall on either side of the meal break. [Citation.] Shorter or longer shifts and other factors that render such scheduling impracticable may alter this general rule." (*Id*. at p. 1032.)

### C. *Underlying Proceedings*

We next examine the parties' showings, with special attention to the evidence bearing on the issues raised on appeal.

#### 1. *E.M.E.'s Evidence*

In seeking summary adjudication on appellant's meal break claim, E.M.E. maintained that appellant admitted in his deposition that no one had ever prevented him from taking 20-minute rest breaks and 30-minute meal breaks, as scheduled by E.M.E. Furthermore, relying on *Brinker*, E.M.E. contended its provision of a "combined" 20-minute rest break complied with section 12(A) of

Wage Order 1-2001. E.M.E. argued that its shift schedules incorporated the requisite amount of rest time -- namely, 20 minutes -- and that no statute or provision of the wage order barred a single combined rest period. E.M.E. also argued that practical considerations rendered infeasible the schedule set forth in section 12(A). To establish those considerations, E.M.E. relied on declarations from Randall Turnbow, Wesley Turnbow, and nine E.M.E. employees.

According to Randall Turnbow, E.M.E.'s founder and chairman, E.M.E.'s work schedules had incorporated the combined 20-minute rest break for over 30 years, as it benefitted the company and its employees. The combined break arose from an informal agreement between management and employees, who preferred a 20-minute rest break in the morning because it "provide[d] them with sufficient time to cook and eat their main meal of the day, which they took in the morning." The combined break also increased productivity, especially in the paint and processing line departments. Randall Turnbow stated: "Prior to each break, the painters have to clean out each paint gun and paint pot and the paint lines in between, and shut down certain equipment. Then, upon returning from the break, the painters have to refill the paint pots and the paint guns and turn the equipment back on. Prior to each break, the processing line employees have to finish all parts, coordinating completion times in a process that typically requires 70 minutes, and then air dry the completed parts. These [p]ainting and [p]rocessing [l]ine efforts take approximately 10 minutes at shutdown and 10 more minutes at the start-up after the break. The fewer times that the shop has to prepare for this hard stop -- which the combined break affords -- the easier it is for them to plan the jobs, and the more efficient it is for the production lines."

Wesley Turnbow, E.M.E.'s Chief Executive Officer, affirmed that the combined rest break allowed employees working on the first shift -- E.M.E.'s

13

largest shift -- to prepare their morning meal or purchase it from a food truck that arrived in the morning. He stated: "From my conversations with employees, I know that they prefer to have the combined break for this purpose." Wesley Turnbow also maintained that the combined break increased productivity for the reasons set forth by Randall Turnbow.

Of the nine employees whose declarations were submitted, eight were assigned to a shift that began in the morning.[6] Those employees stated that they preferred the combined break in the morning because it allowed them to buy a meal from the food truck and provided for a better rest. The employee assigned to the second shift stated that the combined break in the evening promoted productivity. All maintained that they were allowed brief breaks at other times, and that they had heard no employee complaints regarding the combined break.

### 2. *Appellant's Showing*

Pointing to *Brinker*'s discussion of the DLSE opinion letter addressing the timing of rest breaks, appellant contended that E.M.E.'s evidence -- if credited -- failed to demonstrate the exceptional circumstances required to justify the placement of both rest breaks before the meal break (*Brinker*, *supra*, 53 Cal.4th at p. 1032). Furthermore, in an effort to raise triable issues regarding the amount of time workers needed before and after breaks, appellant relied on testimony from his deposition, during which he asserted that painters required little preparation for

---

[6]   Some of the shift schedules described in the declarations reflect small differences from the apparently standard first shift (from 7:30 a.m. to 4:00 p.m.) that are not material to the issues before us.

a break. He also submitted his own declaration, stating that while he worked as a painter on the first shift, "[w]hen it was time for a meal or rest break, [he] and the other painters would unplug the air hose, take air out of [the] gun, switch off the spray boot and lights, and drain the paint back to the gun cap if there [was] still [some] in [the] paint gun. This process [took] approximately 20-30 seconds at most." Appellant further stated that as a supervisor, he "monitored workers in all departments." He was unaware of any machinery or "efforts" that required "nearly" 10 minutes to turn off or shut down and 10 minutes to restart. The workers requiring the most time to prepare for a break were the one or two sandblasters on each shift, who needed at most 5 minutes to remove their equipment. A few other employees required a minute or less to prepare for a break, and most needed little or no time.

Aside from submitting the evidence described above, appellant vigorously challenged the credibility of the declarations submitted by E.M.E., arguing that the employee declarations "were procured under coercive circumstances" and that Wesley Turnbow's declaration offered a reason for the combined rest breaks not reflected in his deposition, namely, that workers required 10 minutes to prepare for a break and 10 minutes to resume production after a break.

D. *Analysis*

We conclude that the trial court erred in granting summary adjudication with respect to the rest break claim. As explained below, under the circumstances established here, section 12(A) of Wage Order 1-2001 obliged E.M.E. to provide a 10-minute rest break in the middle of the work periods occurring before and after the 30-minute meal break "insofar as practicable." The existence of triable issues

15

whether the rest break schedule stated in the wage order was *not* practicable precludes summary adjudication.

### 1.  *Rest Break Timing Requirement*

We begin by examining the timing requirement in section 12(A) of Wage Order 1-2001.  That section, "'the basic provisions of which date back to 1932'" (*Industrial Welfare Com*., *supra*, 27 Cal.3d at p. 715, italics deleted), has "'long been viewed as part of the remedial worker protection framework'" *Brinker*, *supra*, 53 Cal.4th at p. 1027, quoting *Murphy*, *supra*, 40 Cal.4th at p. 1105).  For that reason, it "must be interpreted in the manner that best effectuates th[e] protective intent." (*Brinker*, *supra*, at p. 1027.)  In construing the section, we must avoid "needless policy determinations . . . ." (*Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 587.)

The first sentence of section 12(A) of Wage Order 1-2001, by its plain language, specifies that rest periods should fall in the middle of work periods, "insofar as practicable."  As commonly understood, the term "insofar as" means "[t]o the degree or extent that." (Black's Law Dict. (10th ed. 2014) p. 916; Webster's Third New Internat. Dict. Unabridged (2002) p. 1170.)  Although "practicable" is closely related to the terms "possible" and "feasible," the term ordinarily conveys that the thing so described is capable of being put into practice or accomplished, or alternatively, when the thing in question is practical in nature (for example, a method, aim, or plan), that it is feasible. (Webster's Third New Internat. Dict. Unabridged, *supra*, p. 1780 ["possible to practice or perform; capable of being put into practice, done, or accomplished: feasible <a ~ method> <a ~ aim>]; Black's Law Dict., *supra*, p. 1361 ["reasonably capable of being accomplished; feasible in a particular situation <a practicable plan>"].)

16

We find guidance regarding the meaning of the phrase "'insofar as practical,'" as it appears in section 12(A) of Wage Order 1-2001, from *Morris v. Williams* (1967) 67 Cal.2d 733, 742. There, our Supreme Court examined former Welfare and Institutions Code section 14103.7, which directed the Administrator of the Health and Welfare Agency to make proportionate reductions in the Medi-Cal program (Welf. & Inst. Code, § 14000 et seq.) "'to the extent feasible.'" (*Morris*, *supra*, 67 Cal.2d at pp. 757-758.) The court determined that the phrase "'to the extent feasible,'" as found in that statute, obliged the Administrator to make proportionate reductions absent an adequate justification why they were *not* feasible. (*Ibid*.) Here, the term "insofar as" in the phrase "insofar as practicable" is equivalent to "to the extent," notwithstanding any differences of meaning between the terms "practicable" and "feasible." Accordingly, in the context of section 12(A) of Wage Order 1-2001 the phrase "insofar as practicable" directs employers to implement the specified rest break schedule absent an adequate justification why such a schedule is not capable of being put into practice, or is not feasible as a practical schedule. As observed in *Brinker*, under section 12(A) of Wage Order 5-2001, employers are obliged "to make a good faith effort" to implement the "preferred" schedule, "but may deviate from [it] . . . where practical considerations render it infeasible." (*Brinker*, *supra*, 53 Cal.4th at p. 1031.)

Although section 12(A) of Wage Order 5-2001, does not describe the considerations relevant to such a justification, we conclude that a departure from the preferred schedule is permissible only when the departure (1) will not unduly affect employee welfare and (2) is tailored to alleviate a material burden that would be imposed on the employer by implementing the preferred schedule. As explained above, the wage order must be construed in a manner that promotes its "protective intent" (*Brinker*, *supra*, 53 Cal.4th at p. 1027), namely, to safeguard

17

employee health and welfare (*Industrial Welfare Com. supra*, 27 Cal.3d at pp. 700-701). Furthermore, a departure from the preferred schedule that is merely advantageous to the employer cannot satisfy the requirement stated in section 12(A) of Wage Order 5-2001, as the existence of such an advantage does not, by itself, show that the preferred schedule is not capable of being put into practice. For this reason, the departure must be predicated on facts demonstrating that the preferred schedule would impose a material burden on the employer, and that the departure is necessary to alleviate such burden.

These determinations receive additional support from section 17 of Wage Order 1-2001, which authorizes the DLSE, upon proper application, to exempt employers from certain provisions of the wage order, including section 12. Section 17 states: "If, in the opinion of the [DLSE] after due investigation, it is found that the enforcement of any provision contained in . . . [s]ection 12, Rest Periods, . . . would not materially affect the welfare or comfort of employees and would work an undue hardship on the employer, exemption may be made at the discretion of the [DLSE]." Although this provision addresses the considerations governing an exemption from the DLSE regarding section 12, it establishes that the protection of employee welfare and the existence of a burden on the employer are critical to departures from the preferred schedule.

Our conclusions thus comport with *Brinker* and its discussion of the DLSE opinion letter regarding the timing of rest breaks. As noted above (see pt. B. of the Discussion, *ante*), the opinion letter stated a rest break schedule similar to that implemented by E.M.E. would be permissible only in unusual or exceptional circumstances. Our Supreme Court found no reason to disagree, but held that such departures from the preferred schedule were not conclusively proscribed. (*Brinker*, *supra*, 53 Cal.4th at p. 1032.)

18

## 2. *Grant of Summary Adjudication*

We turn to whether E.M.E. established its entitlement to summary adjudication with respect to the rest break claim. In order to do so, E.M.E. was obliged to demonstrate the absence of triable issues regarding its departure from the preferred rest break schedule set forth in Wage Order 1-2001, that is, that there were no triable issues concerning the existence of considerations adequate to justify that departure. As explained below, E.M.E.'s evidence was sufficient to shift the burden on summary adjudication to appellant, whose responsive showing raised triable issues regarding E.M.E.'s proffered considerations.

In an effort to secure summary adjudication, E.M.E. offered evidence that its combined rest break is not detrimental to its employees. Randall and Wesley Turnbow stated that the combined rest break arose 30 years ago through an informal employer-employee agreement, and remained popular among employees because it gave them an opportunity to eat their main meal, which occurred in the morning, and secure a better rest. According to the declarations from the eight employees assigned to the morning shift, they preferred the combined rest break for those reasons. Furthermore, all nine employees whose declarations were submitted stated that they were allowed other breaks when necessary, and that they had heard no employee complaints regarding the combined rest break.

E.M.E. also offered evidence that implementing the preferred schedule would unduly burden its production processes, and that its combined rest break was tailored to alleviate that burden. Randall and Wesley Turnbow stated that due to the nature of those processes, workers ordinarily required 10 minutes to prepare for a rest break and an additional 10 minutes to resume their activities after a break. The combined rest break thus eliminated the loss of approximately 20 minutes in work time.

In our view, E.M.E.'s showing in support of its rest break schedules, if fully credited, would suffice to support its departure from the preferred schedule. Under that showing, E.M.E.'s schedules are not detrimental to its employees. Although E.M.E. purported to show that the schedules affirmatively benefit employees by allowing them to eat their main meal in the morning and enjoy a longer rest, its showing ascribed those benefits solely to the rest break schedule relating to the first shift. Nonetheless, E.M.E.'s evidence raises the reasonable inference that the rest break schedules are not harmful to its employees on either shift, who generally accept the pertinent schedule with no apparent dissent. Furthermore, under E.M.E.'s showing, its schedules enable it to avoid material economic losses attributable to its particular production activities. Accordingly, E.M.E. shifted the burden on summary adjudication to appellant to raise a triable issue of fact.

In opposition to summary adjudication, appellant offered no evidence directly suggesting that the schedules are detrimental to employees. Rather, his evidence targeted E.M.E.'s contention that implementing the schedule set forth in section 12(A) of Wage Order 1-2001 would impose a burden on E.M.E. Appellant's declaration maintained, on the basis of his experience as a painter and a supervisor, that no material amount of production time is consumed before and after rest breaks. According to appellant, with the exception of one or two workers, employees lost little or no work time in taking breaks.[7]

---

[7]     As noted above (see pt. C.2. of the Discussion, *ante*), appellant also challenged the truth of Wesley Turnbow's assertions regarding the time employees required to prepare for a break and resume work thereafter. This challenge, however, could not raise a triable issue of fact, as absent circumstances not present here, "summary judgment may not be denied on grounds of credibility or for want
*(Fn. continued on next page.)*

20

We conclude that appellant's declaration raised triable issues precluding summary adjudication with respect to the rest break claim. Generally, "the sole declaration of a party opposing a summary judgment motion which raises a triable issue of fact is sufficient to deny that motion." (*Estate of Housley* (1997) 56 Cal.App.4th 342, 359.) As a nonexpert witness, appellant was entitled to provide testimony grounded in his experience and his perceptions as an E.M.E. employee regarding workplace conditions and the temporal length of activities. (*Osborn v. Mission Ready Mix* (1990) 224 Cal.App.3d 104, 111-113; 1 Witkin, Cal. Evidence (5th ed. 2012) Opinion Evidence, § 10, p. 620.) Appellant's declaration thus raised triable issues whether implementing the preferred schedule would be burdensome to E.M.E.

E.M.E. and amici curiae contend that the trial court, in granting summary adjudication, correctly concluded that E.M.E.'s rest break schedules, in fact, implement the preferred schedule set forth in the wage order, thus rendering it unnecessary for E.M.E. to justify a departure from the preferred schedule.[8] Relying on the discussion in *Brinker* regarding the provision of meal breaks, E.M.E. and amici curiae argue that under the specification of the preferred schedule stated in section 12(A) of Wage Order 5-2001 -- namely, that employers must authorize "rest periods, which . . . shall be in the middle of each work period" -- an employer is obliged only to ensure that the meal and rest breaks, taken together, divide a work shift into approximately equal "work period[s]."

---

of cross-examination of witnesses furnishing affidavits or declarations in support of the summary judgment . . . ." (Code Civ. Proc., § 437c, subd. (e).)

[8] We granted a request from the California Hospital Association, Civil Justice Association of California, The California Retailers Association, and California Association of Health Facilities to submit a brief as amici curiae curiae.

They further argue that E.M.E.'s shift schedules satisfy that requirement, as the combined rest break and meal break subdivide each shift into approximately equal intervals of work. As explained below, we reject their interpretation of the preferred schedule.

In *Brinker*, the Supreme Court discussed the meaning "work period" in examining the employer's duty to provide meal breaks under section 11(A) of Wage Order 5-2001. (*Brinker*, *supra*, 53 Cal.4th at pp. 1041-1049.) The section states: "No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes, except that when a work period of not more than six (6) hours will complete the day's work the meal period may be waived by mutual consent of the employer and employee." The court determined that under section 11(A) of Wage Order 5-2001, absent a waiver, "an employer's obligation is to provide a first meal period after no more than five hours of work and a second meal period after no more than 10 hours of work." (*Brinker*, *supra*, at p. 1049.) In so concluding, the court rejected a contention that the term "'"work period"'" necessarily means a "'"continuing period of hours worked.'"" Noting that the wage orders contain no definition of "'work period,'" the court determined that the term may encompass an interval of work broken by a meal break, as most wage orders "refer[] to a 'work period of more than . . . 10 . . . hours per day' before a *second* meal period." (*Brinker, supra,* at pp. 1048-1049, italics added.)

In view of *Brinker*, the term "work period" in section 12(A) of Wage Order 1-2001 is potentially ambiguous, and thus must be interpreted in context. Section 12(A) states: "Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked

22

daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof."

As the second sentence of section 12(A) of Wage Order 1-2001 specifies the rate of which rest time accrues without using the term "work period," our focus is on the first sentence. There, the term "work period" cannot reasonably be understood to mean the entire length of a employee's shift -- for example, an 8-hour shift -- as that interpretation would oblige employers to schedule "rest periods" in the middle of the shift, that is, at the 4-hour mark. The sentence thus presupposes that the employee's shift *already* has been divided into "work periods." Because the sentence sets forth the preferred timing of rest breaks, the pre-existing "work periods" must be established by meal breaks. For that reason, in an 8-hour shift with a single meal break, the preferred schedule requires the provision of a rest break in the middle of each "work period" before and after the meal break. As noted above (see pt. B. of the Discussion, *ante*), our Supreme Court in *Brinker* so interpreted section 12, stating: "[I]n the context of an eight-hour shift, "'[a]s a general matter,'" one rest break should fall on either side of the meal break. [Citation.] Shorter or longer shifts and other factors that render such scheduling impracticable may alter this general rule." (*Brinker*, *supra*, 53 Cal.4th at p. 1032.) Those remarks "carr[y] persuasive weight and should be followed," as they reflect a considered discussion of the issue. (*Smith v. County of Los Angeles* (1989) 214 Cal.App.3d 266, 297.)

In a related contention, E.M.E. and amici curiae maintain that Wage Order 1-2001 permits combined rest breaks.[9]  Although we agree that the wage order does not conclusively bar combined rest breaks, E.M.E. and amici curiae have identified no authority establishing the permissibility of E.M.E.'s combined rest break as a matter of law.  The federal decisions upon which E.M.E. relies conclude that combining a rest break with another break may be permissible, but do not examine when that is the case; moreover, because they predate *Brinker*, their discussion is not informed by its analysis.  (*Villa v. Tyco Elecs. Corp., Inc.* (N.D. Cal. Jan. 7, 2011) Case No. C10-00516 MHP [2011 U.S. Dist. LEXIS 1697, *9-*10]; *Porch v. Masterfoods U.S.A. Inc.* (2008) 685 F.Supp.2d 1058, 1075.)  Similarly, the IWC documents to which amici curiae have directed our attention establish that the IWC viewed combined rest periods as permissible in some situations, but the documents describe only one, namely, when an employer's business requires shifts in which the meal period occurs soon after employees report for work.  That is not the case for E.M.E.'s employees.

Finally, E.M.E. contends appellant's declaration failed to raise a triable issue because it is inadmissible.[10]  In opposing summary judgment, appellant submitted an executed declaration in Spanish and a translation in English,

---

[9]     In support of that contention, amici curiae have requested judicial notice of an excerpt from a 1959 IWC enforcement manual and an IWC opinion letter dated August 15, 1983.  We take notice of those materials.

[10]     In the trial court, E.M.E. challenged statements in appellant's declaration on the basis of lack of personal knowledge (Evid. Code, § 702, subd. (a)) and lack of "foundation[]"; (Evid. Code, § 403, subd. (a) [authorizing court to make threshold determinations regarding admissibility of evidence]).  As the court did not rule on the objections, they are deemed overruled.  (*Google*, *supra*, 50 Cal.4th at p. 534.)  E.M.E. has not renewed those objections on appeal.

unaccompanied by a declaration certifying the translation's accuracy. Although E.M.E. asserted no objection to the declaration regarding that defect before the trial court, it maintains that we must exclude the declaration from our review. We disagree.

Under the summary judgment statute, objections to declarations are generally forfeited when not asserted before the trial court. (Code Civ. Proc., § 437c, subd. (d).)[11] That rule is applicable to technical defects in declarations. (*Rader v. Thrasher* (1972) 22 Cal.App.3d 883, 889.) Furthermore, because a translator's failure to state under penalty of perjury that a translation is accurate does not render the underlying testimony inadmissible per se, a party must assert a timely challenge to the translation. (*People v. Carreon* (1984) 151 Cal.App.3d 559, 579-581.) The function of that rule is to provide an opportunity before the trial court to correct the deficiency regarding the translation. (*Ibid*.) As E.M.E. asserted no pertinent objection, appellant was denied any such opportunity. (See *Weiss v. Chevron, U.S.A., Inc.* (1988) 204 Cal.App.3d 1094, 1098 [in reviewing a summary judgment motion, trial court may consider late-filed declarations, provided opposing party is afforded notice and an opportunity to respond].) E.M.E. has thus forfeited its challenge to appellant's declaration.

Because summary adjudication was improperly granted with respect to appellant's rest break claim (the second cause of action), it was also improperly

---

[11]    Subdivision (d) of Code of Civil Procedure section 437c provides: "Supporting and opposing affidavits or declarations shall be made by a person on personal knowledge, shall set forth admissible evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavits or declarations. An objection based on the failure to comply with the requirements of this subdivision, if not made at the hearing, shall be deemed waived."

25

granted with respect to the "derivative" claims (the third through seventh causes of action). The grant of summary judgment must therefore be reversed, insofar as it relates to those claims.

## DISPOSITION

The judgment is affirmed with respect to appellant's first cause of action, and reversed as to the remaining causes of action. The matter is remanded for further proceedings in accordance with this opinion. Appellant is awarded his costs on appeal.

**CERTIFIED FOR PUBLICATION.**


MANELLA, J.


We concur:



EPSTEIN, P. J.



WILLHITE, J.